1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CONNOR HEPLER and AARON LANCASTER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br>         vs. <br><br> VALVE CORPORATION, <br><br>         Defendant. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

**TABLE OF CONTENTS**

**I.    CONTENTS**

I.     OVERVIEW OF THE ACTION ................................................................ 1

II.    PARTIES ................................................................................................. 5

III.   JURISDICTION AND VENUE ............................................................... 5

IV.   FACTUAL ALLEGATIONS .................................................................. 7

    A. Background ........................................................................................ 7

       1.   Valve Establishes Its Dominant Position in PC Game Distribution ...................... 8

       2.   Publishers Must Have Access to Steam and Steam Keys to Meaningfully Participate in the Market ............ 12

       3.   Valve Propagates Its Anticompetitive Rules and Pricing Through Its Contracts with Publishers ............ 16

V.    RELEVANT MARKETS ....................................................................... 18

    A. Relevant Product Markets ............................................................... 18

       1.   The Relevant Product Markets Are Limited to PC Games ................... 18

       2.   PC Game Distribution Is a Relevant Market ................... 22

       3.   A Relevant Product Market is PC In-Game Payment Processing ................... 23

    B. The Relevant Geographic Market Is at Least as Broad as the United States ............... 24

VI.   Valve Possesses Monopoly and/or Market Power in the Relevant Markets ............... 25

    A. Valve's Steam Leads in PC Games and In-Game Payment Processing. ............... 25

    B. There are High Barriers to Entry. ................................................... 27

    C. Major, Well-Resourced Rivals Have Been Unable to Compete with Steam ............... 29

    D. There is Direct Proof of Valve's Monopoly and/or Market Power. ............... 36

VII.  Valve Has Unlawfully Restrained Trade and            Monopolized the PC Game Distribution Market ............... 38

    A. Valve Uses Its PMFN to Prevent Competition on Price ............... 38

    B. Valve Has Further Restricted Competition by Tying Its In-Game Payment Processing System with Its PC Game Distribution ............... 42

VIII. ANTICOMPETITIVE EFFECTS ............................................. 43

    A. Valve's Inflated Commission Rate Is Unrelated to Its Costs or Steam's Benefits ............... 47

    B. Valve's Commission Rate Would Be Forced Down by a Competitive Market ............... 51

    C. Valve's Conduct Forecloses Other Stores Offering More Competitive Commission Rates ............... 54

D.   Valve's Conduct Excludes Potential Rivals from the Market ........................ 57

IX.     CLASS ACTION ALLEGATIONS ...................................................... 58

X.      FRAUDULENT CONCEALMENT .................................................... 60

XI.     CAUSES OF ACTION ...................................................................... 61

XII.    PRAYER FOR RELIEF .................................................................... 68

XIII.   JURY DEMAND ............................................................................. 69

CLASS ACTION COMPLAINT
PAGE-ii

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

Plaintiffs Connor Hepler and Aaron Lancaster, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this action against Valve Corporation under federal antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

## I.    OVERVIEW OF THE ACTION

1.    Over the last two decades, the personal computer ("PC") video game industry has grown to a staggering size. Current estimates place the PC gaming industry's annual revenues at roughly $40 billion annually[1]—about $10 billion more than the global music industry.[2]

2.    As the PC gaming industry has exploded, one company—Defendant Valve, Inc.— has used its monopoly position to capture a disproportionate share of this growth. In 2005, Valve launched the Steam Store, an online platform where consumers can purchase PC games from third-party game publishers, and quickly became the dominant player in the industry. Valve maintains this dominance today: Of the billions of dollars in annual PC game sales, roughly three quarters run through the Steam Store, making it—by far—the largest game store both domestically and globally.

3.    Due to Valve's controlling position, publishers have little choice but to list their games on the Steam Store if they hope to reach a sufficiently widespread audience. This leverage allows Valve, despite its limited role as a middleman, to extract a commission of *30%* on every game sold. This massive commission is untethered to Valve's costs, and it is far higher than the rate that would prevail in a competitive market. As a result, publishers have a strong incentive to raise their game prices to stay profitable, which leads to higher prices for consumers.

---

[1] Simon Read, *Gaming is booming and is expected to keep growing. This chart tells you all you need to know*, World Economic Forum (July 28, 2022), https://www.weforum.org/agenda/2022/07/gaming-pandemic-lockdowns-pwc-growth/.
[2] Richard Smirke, *IFPI Global Report 2024: Music Revenues Climb 10% to $26.8 Billion*, Billboard (Mar. 21, 2024), https://www.billboard.com/business/business-news/ifpi-global-report-2024-music-business-revenue-market-share-1235637873/.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

4.      Valve has not acquired or maintained its monopoly over game distribution—and the ability to charge supracompetitive prices it affords—by running a more efficient or effective game store than its competitors. To the contrary, Valve has used its monopoly position to stifle competition, imposing anticompetitive restraints to ensure that cheaper, high-quality, consumer-friendly alternatives cannot get off the ground.

5.      Valve restrains competition through the Platform Most Favored Nation clause ("PMFN") that it imposes on any publisher hoping to sell its games on the Steam Store. Valve's PMFN forbids publishers from offering their games on any competing platform for a cheaper price, or with superior features, than it offers on the Steam Store. That is, even if a competing store attempts to compete with Valve by offering a commission lower than Valve's exorbitant 30% commission, it cannot ultimately offer a game to consumers at any lower a price than consumers receive on Steam. Nor can publishers and competitors offer consumers superior features on alternative platforms. The result is that competing platforms have almost no ability to compete with Valve—and the significant network effects that come with its dominant position—on either price or quality.

6.      The predictable result of shutting down competition is that Valve has enjoyed, and continues to enjoy, monopoly profits at the expense of consumers. Due to the Steam Store's limited, middleman role in the market, it requires only a few dozen full-time Valve employees to operate. Indeed, though Valve's 30% commission was set at its founding based on the standard sales commission at brick-and-mortar games stores, the Steam Store—as an online marketplace—pays almost *none* of the fixed costs (such as rent, utilities, and logistics) that justified that cut. Steam's 30% commission generates billions of dollars annually in almost pure profit for only a small number of employees—rendering it, on a per-employee basis, one of the most profitable companies in the world.

7.      Basic economics indicates how a competitive market would respond to such exorbitant profits: Competitors would flood in, offering innovative products at more affordable

CLASS ACTION COMPLAINT
PAGE-2

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

prices and siphoning Valve's market share until such supracompetitive profits were no longer feasible.. But Valve's PMFN—and its continued anticompetitive steps to impose, enforce, and punish attempts to avoid its PMFN—have rendered competition on the merits impossible. As a result, two decades after its founding, Valve continues to enjoy its monopoly position and profits without any viable competition on the horizon. Consumers, meanwhile, are left holding the bag, in the form of higher prices and decreased output and quality.

8.      Indeed, Valve's dominance comes not for competitors' lack of trying. Many large, well-resourced tech companies and game developers—including Epic Games, Electronic Arts, Microsoft, and Discord—have attempted to avoid Steam's fees and launch viable competitor platforms. These stores, moreover, have sought to bring commissions down to competitive levels; as Discord stated when launching its store: "Turns out, it does not cost 30% to distribute games in 2018." But due to Valve's anticompetitive conduct, none of these stores was permitted to compete with the Steam Store on price or quality; as a result, each has been unable to establish a strong commercial strategy to compete with Valve's dominance. Most have since capitulated and rejoined Steam's umbrella.

9.      More recently, Valve turned its anticompetitive playbook—and its monopoly power—on a second market: the market for In-Game Payment Processing. In 2012, Valve launched the Steam Wallet, which allows users to upload funds, pay for, and process so-called "microtransactions" for add-ons, perks, and gear within games they have already purchased. The Steam Wallet connects to the Steam Microtransactions API, which makes Valve the payment processor for Steam Wallet purchases. Like with the games themselves, Valve takes a 30% cut of every microtransaction purchased with a Steam Wallet.

10.      There is no technology- or efficiency-based reason that microtransactions in Steam-purchased games need to be processed by Steam; indeed, in many comparable industries—and on rival platforms—consumers are permitted to use their In-Game Payment Processing System of choice.

CLASS ACTION COMPLAINT
PAGE-3

11.     Nonetheless, Valve allows developers and publishers to sell in-game enhancements only if they require users to pay for the transactions using their Steam Wallets. And again, due to Valve's PMFN and dominance in the PC Game Distribution Market, publishers have little choice but to acquiesce. Rather than serving any legitimate business purpose, this requirement constitutes an unlawful tying arrangement, allowing Valve to use its market power—indeed, its monopoly power—in the PC Game Distribution Market to impose a supracompetitive 30% fee in the In-Game Payment Processing Market.

12.     In fact, this unlawful tie has been so successful that it has allowed Valve to monopolize the In-Game Payment Processing Market as well. Given Valve's overwhelming market share in the PC Game Distribution Market, it has quickly come to be the sole viable option in the Payment Processing Market; as a result, Valve has used its PMFN and anticompetitive tactics to leverage monopoly power in two markets rather than one. The result is a supracompetitive "tax" on the PC gaming industry, which leads to higher prices for fewer and lower-quality games and payment processing options. Meanwhile, Valve's profits continue to grow, and consumers continue to pay the price.

13.     This lawsuit is brought by plaintiffs on behalf of themselves and a proposed class of consumers seeking to address Valve's abuse of its market power. The objective is to redress Valve's efforts to restrain trade, monopolize, and maintain its monopoly in the PC Game Distribution Market and In-Game Payment Processing Market. Valve's practices outlined here violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), and the Washington State Consumer Protection Act (RCW 19.86).[1]

---

[1] In *Wolfire Games, LLC v. Valve Corp.*, this Court compelled arbitration of consumer antitrust claims against Steam based on the Steam Subscriber Agreement ("SSA"). *See* Order, *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D. Wash. Oct. 25, 2021), ECF No. 66. On September 26, 2024, Valve updated the SSA to remove the arbitration agreement and class action waiver, and to require that any action be commenced in state or federal court. The updated SSA explicitly applies retroactively, stating: "You and Valve agree that all disputes and claims between you and Valve (*including any dispute or claim that arose before the existence of this or any prior agreement*) shall be commenced and

## II.   PARTIES

14.   Plaintiff Connor Hepler is a resident of Connecticut. Mr. Hepler has been a Steam customer for at least four years and has purchased PC Desktop Games through the Steam Store during this time. Mr. Hepler has also purchased in-game purchases using his Steam Wallet during his time as a Steam customer. As a result of Valve's anticompetitive practices, Mr. Hepler has paid supracompetitive commissions to Valve for each sale of its PC Desktop Games through the Steam Store.

15.   Plaintiff Aaron Lancaster is a resident of the District of Columbia. Mr. Lancaster has been a Steam customer for at least six years and has purchased PC Desktop Games through the Steam Store during this time. As a result of Valve's anticompetitive practices, Mr. Lancaster has paid supracompetitive commissions to Valve for each sale of its PC Desktop Games through the Steam Store.

16.   Defendant Valve Corporation is the largest distributor of PC games in the world. Incorporated in the State of Washington, Valve's headquarters are located at 10900 NE 4th Street, Suite 500, Bellevue, Washington 98004. It operates the Steam Store, a platform, through which it distributes PC games online.

## III.   JURISDICTION AND VENUE

17.   Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Valve for the injuries to Plaintiffs and the Class, alleged herein, arising from Valve's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiffs also assert claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., seeking restitution, injunctive relief, and other available remedies, and Washington's Consumer Protection Act, RCW 19.86, seeking treble damages and injunctive relief under RCW 19.86.090.

maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction."

CLASS ACTION COMPLAINT
PAGE-5

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

18.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction for the California and Washington state law claims under 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Valve as Valve's headquarters are located in Bellevue, Washington. Valve has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and Washington law such that the exercise of jurisdiction over Valve would comport with due process. Valve has (a) transacted business throughout the United States, including in the Western District of Washington; (b) contracted with publishers, developers, and consumers within the United States, including in the Western District of Washington; (c) had substantial contacts within the United States, including in the Western District of Washington; and/or (d) was engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the Western District of Washington.

20.     Valve also is subject to personal jurisdiction because, either directly or through its agents or affiliates, Valve transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

21.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because Valve is found in and transacts business in this District.

22.     Venue also is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during the relevant period, Valve resided, transacted business, was found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District, as provided in 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d). Further, Valve

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

selected courts located in King County, Washington, as the venue for disputes arising under, in connection with, or incident to the Steam Subscriber Agreement.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

23.    A video game is an electronic game designed to be played on various computing devices, such as PCs, gaming consoles, smartphones, or tablets. In 2021, there were an estimated 3 billion people worldwide who engage in video gaming.

24.    Video games are typically classified based on the type of device they are played on, including PC games (e.g., games for personal computers), console games (e.g., games for PlayStation or Xbox), and mobile games (e.g., games primarily played on smartphones or tablets). Games are created to be compatible only with their designated device type, such as a PC game being playable only on PCs. Furthermore, distinct versions of PC games are often produced for specific platforms, such as Steam.

25.    PC games are video games that users download and install onto their PCs. These games can vary in size, scope, genre, and features, but they all function directly from the computer where they are installed. They require installation on the PC for operation, and all necessary data, including game progress or user preferences (e.g., control configurations, audio-visual settings), is saved on the PC.

26.    PC games have been around nearly as long as PCs themselves. The rise of PCs in the 1980s brought with it an increase in games designed for this new type of computing device. As personal computers became more popular, so too did PC games. By 2020, the global revenue from PC games had reached at least $30 billion.

27.    In the early days of the PC gaming industry, technological limitations meant that most gamers purchased their games from brick-and-mortar stores. These games were sold on physical media like CD-ROMs, which could be taken home and installed on the user's computer.

CLASS ACTION COMPLAINT
PAGE-7

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

28.     Brick-and-mortar retailers incur significant costs that digital retailers avoid, such as expenses related to real estate, shipping, inventory management, and staffing. These retailers typically operate with very thin profit margins. For example, Walmart's net margin – the ratio of net profit to revenue – has averaged just 1.4% over the past decade. In other words, for every $100 in products sold, Walmart retains only $1.40 as profit, with the rest going toward operational expenses like employee wages and real estate. Historically, due to these costs, brick-and-mortar retailers charged game publishers around 30% in commissions to make their games available in the store. However, these stores did not keep the entire 30% as profit; a significant portion went toward their various operational costs.

29.     In contrast, digital distributors of PC games operate at a fraction of the cost incurred by physical stores. This vast difference in operating expenses, combined with the convenience of downloading large PC games directly at home thanks to high-speed internet, paved the way for digital distribution to disrupt traditional retail models. Digital distributors do not face the same overhead as brick-and-mortar stores, allowing them to make more profit on game sales, even at lower commission rates. In a competitive market, without Valve's restrictions, these advantages would have naturally led to reduced commissions and lower prices.

30.     Today, most PC games are sold digitally, with Valve's Steam Store as the dominant digital distributor in this space.

**1.      Valve Establishes Its Dominant Position in PC Game Distribution**

31.     Originally established in 1996 by former Microsoft employees, Valve started as a video game development company. The company's first major release came in 1998 with the launch of *Half-Life*, a critically acclaimed PC game. Valve then expanded its portfolio with other successful game franchises, such as *Portal* and *Counter-Strike*.

32.     Before Valve introduced Steam, its games that supported online multiplayer, including *Half-Life* and *Counter-Strike*, utilized a third-party network known as the World Opponent Network (WON). Created by Sierra, the initial publisher of *Half-Life* and several other

CLASS ACTION COMPLAINT
PAGE-8

1    PC games, WON was later acquired by Valve in 2001. With this acquisition, Valve took control of

2    WON's user base, which numbered 1.5 million players. As Valve worked on developing the Steam

3    platform, it continued to run WON, offering support for *Half-Life*, *Counter-Strike*, and other

4    Sierra-published games.

5        33.    Valve's business strategy underwent a significant change in 2003 with the

6    introduction of Steam. The platform initially focused on providing a way to patch and update

7    Valve-developed games. Patches addressed software flaws, or "bugs," while updates often

8    introduced new features or content. Prior to Steam, Valve struggled with delivering patches and

9    updates, particularly since its games frequently included an online multiplayer component that

10    required synchronization across various game versions owned by different users. Because users

11    frequently had different game versions (e.g., v1, v1.1, v1.2), compatibility issues often arose,

12    preventing players from gaming together. Steam addressed this by offering a centralized location

13    for users to receive software updates, ensuring their games were kept up to date.

14        34.    In November 2004, Steam transitioned from being solely a patching and version-

15    control platform to including a storefront component when Valve released *Half-Life 2*. This

16    marked the first-time consumers could purchase a digital copy of a game through Steam, in

17    addition to the traditional physical version. However, Valve made it mandatory for players to use

18    the Steam platform to play *Half-Life 2*, regardless of where they purchased the game. Customers

19    needed to create a Steam account and install the platform on their PC. Traditional distribution

20    channels provided customers with codes that could be submitted to Steam to add *Half-Life 2* to

21    their libraries.

22        35.    By requiring players to use Steam to play *Half-Life 2*, Valve began to establish what

23    was later described as a "stranglehold on PC gaming."[2] Consumers were left with no option but to

24    use Valve's new platform to access the blockbuster hit *Half-Life 2* and other popular Valve titles.

---

[2] Zachariah Kelly, *Why Valve's Stranglehold on PC Gaming Might Finally Be Coming to an End*, AU Review (Dec. 10, 2018), https://www.theaureview.com/games/why-valves-stranglehold-on-pc-gaming-might-finally-be-coming-to-an-end/.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

Rather than relying on the platform's merits, Valve effectively compelled consumers to adopt Steam as a prerequisite to play its marquee games.

36.     In 2004, Valve took an additional step by shutting down WON, forcing all its users to download and install Steam for multiplayer features—even those who had purchased *Half-Life* and *Counter-Strike* years before Steam existed. By leveraging a popular game and controlling a major multiplayer network, Valve accomplished what smaller publishers like Stardock and non-publishers such as GameStop and Direct2Drive could not: it succeeded in pushing its gaming platform into the market.

37.     Valve soon began partnering with third-party game developers, allowing them to distribute their games digitally on Steam in exchange for a share of the revenue. This extended Valve's reach and forced customers of non-Valve games to also install the Steam platform. Currently, Steam hosts at least 50,000 games, the majority of which are from third-party developers.

38.     Unlike other distributors that sell multiple versions of games compatible with different platforms, Valve does not offer games designed for other gaming platforms in the Steam Store. For instance, when Electronic Arts (EA) launched its own PC gaming platform, Origin, Valve declined to sell Origin-enabled versions of games through its store. EA noted at the time: "At present, there is only one download service [Steam] that will not allow this relationship. . . [The Steam Store] has imposed a set of business terms for developers hoping to sell content on that service—many of which are not imposed by other online game services."[3]

39.     The growth of Valve as a company has closely followed the success of Steam. In 2005, *Forbes* estimated Valve's gross revenue to be around $70 million. By 2012, the company's value had exceeded $3 billion, with Steam's sales having doubled each year for the previous seven years. *Forbes* attributed Valve's dominant position—capturing up to 70% of the market—to a lack

---

[3] Wesley Yin-Poole, *Why you can't buy Crysis 2 from Steam*, EURO-GAMER (July 7, 2011), https://www.eurogamer.net/articles/2011-07-07-why-you-cant-buy-crysis-2-from-steam.

CLASS ACTION COMPLAINT
PAGE-10

of competition. In 2011, Valve's CEO, Gabe Newell, described the company as "tremendously profitable." With just 250 employees, Valve was more profitable per employee than either Google or Apple. At that point, the company's estimated value ranged between $2 billion and $4 billion, holding a market share of anywhere from 50% to 70%.

40.     Valve's market capitalization soared to $10 billion by 2019. In 2017, Steam generated over $4.3 billion in sales, a figure that did not even include revenue from in-game purchases and downloadable content (DLC), both of which are also significant income sources. It is estimated that Steam continues to generate billions in annual revenue for Valve. The platform remains the company's largest source of revenue, as Valve takes a percentage of every sales transaction, including those for third-party games, DLC, and in-game purchases.

41.     Valve is now the world's largest distributor of PC games, holding an estimated 75% of the global market. In 2020, Steam reported 120 million monthly active users, 25 million peak concurrent users, and 2.6 million new purchases per month. Additionally, the platform has accumulated over one billion user accounts.

42.     The Epic Games Store, Steam's most significant competitor, sold approximately $265 million worth of third-party games in 2020—a small fraction of the billions sold on Steam.

43.     Since 2017, Valve has developed and released only one PC game, instead relying heavily on the substantial revenue generated by Steam. Despite this, Valve's investment in Steam has remained minimal, as its anticompetitive practices have allowed it to retain dominance without needing to focus on the platform's quality.

44.     Furthermore, Valve's Steam platform provides it with direct access to private business information from nearly all competing development studios. This data includes insights into customer demographics, gameplay habits, player interactions, communications, geographic locations, and financial information from publishers. Through the Steam Keys program, which is discussed in more detail below, Valve has also acquired extensive internal data on its competing

CLASS ACTION COMPLAINT
PAGE-11

storefronts' operations. However, Valve does not share any of this information with publishers on the Steam Store, even in an anonymized and aggregated format.

45.     For its early development of a digital distribution system capable of supporting third-party applications, Valve has already enjoyed substantial rewards. As outlined below, the company now employs various strategies to enhance and sustain its market power, ensuring that publishers and consumers remain dependent on Steam while blocking potential competitors from entering the PC game distribution market.

## 2.     Publishers Must Have Access to Steam and Steam Keys to Meaningfully Participate in the Market

46.     Due to Steam's dominance and its exclusion of potential competitors, publishers must have their games listed on Steam to adequately access the market and earn revenue. Access to Steam Keys is also essential for publishers in order for their games to be available on Steam. As such, the vast majority of publishers that offer games on Steam have requested and received Steam Keys.

47.     A Steam Key is essentially a product authorization code generated by Valve, allowing access to a game hosted on the Steam platform. These keys are alphanumeric codes that authenticate users and grant a Steam license to verified purchasers.

48.     Publishers utilize Steam Keys in various ways: to sell copies of Steam-compatible games through other stores, to provide promotional access to media and industry insiders, to conduct small-scale beta tests of games in development, or to offer access to developers working on the game.

49.     However, when selling Steam Keys, publishers must adhere to Valve's PMFN, giving Valve control over pricing throughout the gaming industry.

50.     Publishers must request Steam Keys from Valve, which has the sole discretion to approve these requests. Once a request is granted, Valve provides a text file filled with 15-character text strings, each representing a unique Steam Key. Publishers can then forward this file

to other stores for selling the keys to customers, who can later use these keys to enable their purchased games on Steam.

51.     Both digital and physical stores sell games through Steam Keys. Sales of Steam-enabled games surpass those of games built for other platforms. Reflecting the shift to digital distribution, brick-and-mortar retailers now typically sell product boxes containing digital download codes instead of physical discs. With physical distribution of PC games being minimal today, publishers must sell games online to reach consumers. Most digital stores also sell Steam Keys rather than versions of the game designed for a different client.

52.     Competitors attempting to challenge Steam in the PC game distribution market—including Amazon, GameStop, Walmart, Target, Green Man Gaming, Humble Bundle, and GOG—generally sell Steam Keys. Despite these sales involving games compatible with Steam, they constitute a small share of the overall market.

53.     Thus, these alternative outlets do not offer publishers a distribution channel for PC games independent of Steam and free from Valve's influence. Nor do they significantly constrain Valve's market power. In 2018, Green Man Gaming disclosed an annual revenue of £47.5 million (about $60 million) for 2017, with 4.7 million registered users and one million active customers, estimating its market share at less than 1%. Similarly, Humble Bundle's annual revenue is also a fraction of the market, estimated between $10 and $50 million.

54.     Valve further ensures that Steam Keys are distributed using a low-quality and insecure method, which hinders meaningful competition even on non-price dimensions.

55.     As previously mentioned, Steam Keys are generally distributed via text files containing 15-character codes. A bad actor with access to these simple text files at any point in the distribution chain can copy or remove some or all of the Steam Keys and resell them without compensating the publisher. Additionally, the same key can be sold multiple times, but it will only work for the first player who adds it to their Steam account, thereby defrauding other consumers. Publishers also risk selling a key to a reseller outside of their control, who can defraud consumers

and damage the publisher's reputation because the game may not run on Steam. Similarly, a purchaser of a Steam Key risks buying a fraudulent code that does not add the game to their Steam library.

56.     Certain third-party stores like Green Man Gaming and Humble Bundle are authorized retailers of Steam Keys and have implemented measures to prevent such fraud. However, the security flaws within the Steam Key system have given rise to a "grey" market where Steam Key resellers or fraudsters sell Steam-enabled games without publisher permission. For example, keys may be sold by an individual who illegally purchased them using stolen credit card information, bought them in bulk during a Steam sale to later resell for profit (in violation of Steam's terms of service), or posed as a member of the press to obtain a free promotional key.

57.     Because second-hand Steam Keys are generally cheaper, the value of first-hand sales from the publisher is reduced.

58.     There is no valid reason or justification for maintaining this insecure, fraud-prone system for distributing Steam Keys. This became evident when the third-party store Humble Bundle attempted to introduce reforms and transparency in the distribution process.

59.     Humble Bundle initially offered game "bundles" where customers could pay any price they wished to acquire multiple games. Users could choose how their payment was divided among the publishers or donated to a charity. This model proved popular with both consumers and publishers. Following the initial "Humble Indie Bundle" event in 2010, Humble Bundle continued organizing similar events on an increasingly larger scale. These events sold hundreds of thousands of bundles, transferring millions of dollars to publishers and charities. In total, Humble Bundle's charitable donations have amounted to over $197 million.

60.     Due to Steam's prominence, customers requested that Humble Bundle include Steam Keys in their events for convenience, to which Humble Bundle agreed. However, the security flaws in the Steam Key system led to problems. Customers often only added some of the keys in the bundle to their personal Steam accounts, leaving the others unused. Since these keys

CLASS ACTION COMPLAINT
PAGE-14

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

were merely text strings, they could be easily resold, fueling the grey market. This made publishers hesitant to participate in Humble Bundle events, as they lost control over the price and distribution of their Steam Keys, diminishing the value of their products.

61.    Humble Bundle addressed this issue by collaborating with Valve to create a direct integration between its store and the Steam platform. Customers who purchased a bundle could choose either to download the games directly or to link them to a specific Steam account. If they selected the latter, the integration would automatically add all the games to the customer's Steam account for use on Steam.

62.    This method ensured that sales were legitimate because Valve directly added the games to the player's Steam account. With the direct integration eliminating the exposure of Steam Keys, the system was more secure. Consequently, Humble Bundle's sales grew, as publishers were no longer concerned about their Steam Keys ending up in the grey market.

63.    However, once Humble Bundle's distribution of Steam-enabled games started to grow, Valve abruptly ended the secure integration with the Steam platform. This forced Humble Bundle to return to selling insecure Steam Keys. The removal of the direct integration led to a decline in Humble Bundle's sales growth.

64.    Valve's decision to cut off Humble Bundle's keyless integration has no legitimate technical or other justification. The termination of this integration can only be explained as an anticompetitive move—Valve acted because Steam was facing increased competition. This reversal caused significant harm to both publishers and consumers.

65.    Similarly, Valve's competitors, Ubisoft and Epic Games, offer "keyless" distribution programs, solving the security issues inherent in Steam Keys. For example, the Epic Games Store (EGS) began providing keyless integration with third-party stores so that an EGS-enabled game purchased elsewhere is instantly added to a gamer's EGS library, allowing publishers to avoid the risks of key-based models.

CLASS ACTION COMPLAINT
PAGE-15

66. By entrenching Steam Keys as the industry standard and imposing its PMFN across the market, Valve further harms publishers. Publishers rely on Steam Keys to promote their games, including offering free access to media or marketing their game to larger publishers that might invest. Investors, distributors, and publishers in the PC gaming industry require Steam Keys to evaluate a game for potential funding, marketing support, or distribution. Industry media also require publishers to provide Steam Keys when testing and reviewing games before they are released to the general public. These entities will only accept Steam Keys, not an alternative like an .exe file, as they seek to protect themselves from alleged breaches of nondisclosure agreements or intellectual property violations.

67. Steam Keys allow Valve to cement its position as the industry standard game client and authorization system, keeping publishers dependent on it for any meaningful market access in PC game distribution.

### 3. Valve Propagates Its Anticompetitive Rules and Pricing Through Its Contracts with Publishers

68. Valve mandates that publishers looking to market Steam-enabled games sign up as a Steamworks Partner with Valve. Additionally, Valve requires these publishers to list their games for sale on the Steam Store.

69. To become a Steamworks Partner, publishers must contract with Valve through the Steam Distribution Agreement (SDA). Valve also provides extensive rules within the Steamworks Documentation, which governs the use of the necessary Valve software to make a game compatible with the Steam platform.

70. Steamworks is described as "a set of tools that enable you to distribute your product to Steam customers and a set of features you can use in your product." To publish a game on Steam, a publisher needs to create a Steamworks developer account. During this account creation process, the publisher must agree to the standard SDA terms and pay a $100 Steam Direct fee for each product they intend to distribute on the platform.

CLASS ACTION COMPLAINT
PAGE-16

71.     After becoming a Steamworks Partner, the publisher can download the Steamworks Software Development Kit (SDK), which provides "all the scripts and templates for building and uploading your product to Steam." Publishers are then required to make their Steam-enabled games available for sale on the Steam Store. The tools provided by the SDK ensure a game is compatible with Steam, and using the SDK is necessary for any game that a publisher wants to list on Steam. One key component, SteamPipe, is required to upload content to the Steam platform, making Steamworks essential for any publisher aiming to publish and sell their game on Steam. Therefore, all publishers must become Steamworks Partners and follow the Steamworks Documentation rules, in addition to adhering to the terms of the SDA.

72.     Valve has embedded numerous rules throughout the Steamworks Documentation, collectively referred to as the "Steamworks Rules," which are binding on publishers. The SDA also obliges publishers to ensure their games are compatible with any Steamworks features used, which includes complying with the Steamworks Rules, and it also references and incorporates these rules.

73.     The Steamworks Rules carry the same weight as the terms in the SDA but provide Valve the flexibility to modify the terms without the need to amend the contract itself. For instance, in April 2018, Valve adjusted its Steam Key request process to increase its control over Steam Keys by simply updating the relevant Steamworks Documentation.

74.     Under the SDA, Valve takes a percentage of every sales transaction. Valve also acts as the payment processor for all transactions, remitting the monthly sales revenue to publishers minus its share (along with any other fees or holdbacks). While publishers set their own pricing for games sold on Steam, Valve's revenue cut remains fixed.

75.     Together, the SDA and Steamworks Rules constitute the written element of the Valve PMFN. Valve's interpretation and strict enforcement of these provisions reveal the full extent of the competitive restraint imposed by the PMFN.

1  **V.    RELEVANT MARKETS**

2     **A.    Relevant Product Markets**

3        76.    Valve leveraged its monopoly and/or market power in several anticompetitive ways

4  to maintain and enhance its monopoly and/or market power. To the extent that Plaintiffs must

5  prove monopoly and/or market power circumstantially by first defining a relevant product market,

6  Valve competes in at least two distinct product markets: (1) the market for PC Game Distribution,

7  and (2) the market for PC In-Game Payment Processing. As an initial matter, each market is

8  appropriately limited to PC games, as opposed to other types of games.

9           **1.    The Relevant Product Markets Are Limited to PC Games**

10       77.    The term "PC games," as used in this complaint, refers specifically to games that

11  are installed directly on a user's personal computer (PC). This definition excludes web browser

12  games, as discussed further below, even though they may be played on a PC.

13       78.    PC games are not reasonably interchangeable with other types of games, such as

14  console games (e.g., gaming consoles like Microsoft Xbox or Sony PlayStation) or mobile games

15  (e.g., game played on a cellular device). PC games can only be played on PCs and are

16  incompatible with gaming consoles and mobile devices.

17       79.    Games designed for consoles or mobile devices do not serve as economic

18  substitutes for PC games. Various factors influence consumers' preferences. The differences in

19  user experiences and gaming functionalities between PC, console, and mobile platforms play a

20  significant role in determining whether a consumer will purchase a PC game. Furthermore, PCs,

21  consoles, and mobile devices each have additional non-gaming uses that influence their cost and

22  perceived value to the user.

23       80.    PC, console, and mobile gaming are generally seen as complements rather than

24  substitutes because they serve different purposes. A PC game can handle more sophisticated

25  graphics and larger memory requirements than a console or mobile game. Mobile devices, in

26

27

28  CLASS ACTION COMPLAINT
    PAGE-18

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

1    particular, have processing constraints that make it impossible to match the complexity of

2    animation, audio, and graphics that PC games offer.

3        81.    Along with superior visual effects, PCs also provide more immersive and

4    customizable control options for gamers. While PC users have the flexibility to use keyboards,

5    mice, joysticks, and even console-like controllers, console gamers are limited to the

6    manufacturer's controllers or a few authorized third-party alternatives. This flexibility in control

7    options is a major reason many gamers prefer PC gaming over console gaming.

8        82.    The experience of playing a game on a PC using a keyboard and/or mouse is

9    different from using a console linked to a TV or playing on a small mobile device. Furthermore,

10   most game titles are not uniformly available across PC, console, and mobile platforms due to

11   differences in gameplay experiences and hardware capabilities.

12       83.    Gamers make intentional decisions about the hardware systems they use and tend to

13   stay on that platform due to lock-in effects. For example, a player who owns an Xbox and has

14   invested in various Xbox accessories, such as controllers, cannot simply switch to a PlayStation

15   version of a game without repurchasing all of their hardware. This creates a barrier to switching

16   between platforms. An advantage of PCs compared to consoles is that most people already own a

17   PC, meaning they do not incur extra hardware costs to start gaming on a PC.

18       84.    Even for those gamers who own multiple hardware systems—such as both a PC and

19   an Xbox—the versions of games across these systems are not interchangeable. This is because

20   each system offers unique functionalities and features, as mentioned earlier. An Xbox-compatible

21   game cannot run on a PC, and vice versa.

22       85.    Gamers also build extensive game libraries and social networks on their chosen

23   platforms, which makes it less likely they will switch to a different system. For example, a gamer

24   with a large Steam library and many friends on Steam is unlikely to buy the Xbox version of a

25   game available on both platforms, even if they own an Xbox.

26

27

28   CLASS ACTION COMPLAINT
     PAGE-19

86.     Similarly, gamers who play multiplayer games often develop large social networks on specific gaming platforms, and switching platforms may cause them to lose the ability to play those games with their friends. Not all games that offer online multiplayer options allow cross-platform play. For example, a game available on both PC and PlayStation may not permit PC gamers to play with PlayStation gamers. This limitation also applies across different PC gaming platforms like Steam and the Epic Games Store.

87.     Additionally, there are significantly more games available for PCs than for consoles. For example, Steam offers over 50,000 games, while platforms like Xbox One, PlayStation 4, and Nintendo Switch have approximately 3,000 games each.

88.     These differences lead to a low cross-elasticity of demand between PC games and console games. As a result, consumers are unlikely to switch to console games if the price of PC games increases.

89.     The cross-elasticity of demand between PC games and mobile games is even lower, as most mobile games are offered free of charge and rely on ads or in-game purchases for revenue. When mobile games do have a price, it is usually much lower than the price of PC games. Unlike PC games, the vast majority of mobile gaming revenue comes from in-game transactions rather than the purchase price of the mobile game.

90.     In addition, consumers typically do not replace PC games with mobile games designed for shorter, on-the-go play in response to an increase in PC game prices. Similarly, consumers of PC games will not switch to mobile games when there are output reductions in PC gaming.

91.     The differences between PC games, console games, and mobile games also result in unique distribution models for each category, which contributes to the distinct nature of their respective distribution markets. While PC games transitioned to digital distribution early, console games still rely heavily on physical distribution. In contrast, mobile games are exclusively distributed digitally through app stores optimized for mobile devices.

CLASS ACTION COMPLAINT
PAGE-20

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

92.     Mobile app stores do not sell PC games, and PC game stores do not carry mobile apps, although sometimes different versions of a game title might be available for both PC and mobile platforms. Similarly, consoles have their own exclusive digital storefronts specific to the console brand, such as PlayStation or Xbox, that do not sell PC games, and vice versa. Since these games are downloaded to the specific device after purchase, they must be accessed by the compatible hardware—whether it's a PC, console, or mobile device. A publisher cannot sell a PC game on the PlayStation Store or the Apple App Store to counter Valve's high revenue-sharing requirements.

93.     Valve itself acknowledges that PC games do not compete with mobile games. Valve has stated: "Valve does not make or sell phones, tablets, or video games for mobile devices, nor does it operate in the mobile market. Valve runs Steam, an online platform that allows users to purchase and play PC games on their laptops and desktops. Steam users cannot buy or use mobile apps on Steam." Valve has further clarified that it "does not compete in the mobile market or sell 'apps.'"

94.     Furthermore, the size of game files highlights why games on different platforms—PC, console, and mobile—are complements rather than substitutes, and why their distribution channels cannot be reasonably interchanged. Factors like rich graphics, textures, audio, and maps significantly increase a game's data volume. For example, in 2020, the average size of an iOS mobile game was 465 MB, compared to 264 MB in 2016. Even the most basic PC games are usually larger, featuring more advanced graphics and higher-resolution textures.

95.     Industry experts and analysts acknowledge that PC games, console games, and mobile games are distinct categories, each with its own metrics. Market research often separates data on these categories to reflect their unique characteristics.

96.     Non-desktop PC games—such as browser-based games playable on platforms like Facebook—are not considered interchangeable with PC desktop games. These browser-based games represent the lower end of the gaming spectrum. Before the rise of mobile gaming, browser-

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

based games were a common way to enjoy casual gaming experiences. However, given the limitations of web browsers, these games were constrained in terms of quality and performance. As mobile gaming gained popularity, developers increasingly shifted resources from web browser games to mobile platforms. Today, although web browser games still exist, they have become less prevalent and now primarily compete with mobile games.

97.     For all of these reasons, PC games are not reasonable substitutes for other types of games, and consumers will not simply pivot to mobile or console games as a result of a price increase for PC games.

## 2.     PC Game Distribution Is a Relevant Market

98.     Valve competes in the market for PC Game Distribution. Distributors of PC games compete with each other to attract both game publishers and consumers to their storefronts, where they facilitate the sale and purchase of PC games.

99.     A distributor of PC games can only succeed if it has sufficient scale on both the publisher and consumer sides of the market: A distributor will appeal to publishers only if it has a sufficient user base of consumers waiting to purchase their games; likewise, it will appeal to gamers only if it has a sufficient library of games from publishers.

100.    Valve competes in the market for PC game distribution by operating the Steam Store. As described above, PC games and other video games are not reasonably interchangeable. As a result, distribution of PC games is not reasonably interchangeable with distribution of other categories of games. In economic terms, there is not a significant positive cross elasticity of demand between PC game distribution and the distribution of other types of games.

101.    A hypothetical monopolist in the market could impose a small but significant, non-transitory increase above competitive prices for PC Game Distribution services without causing such a significant loss of sales such as to make the increase unprofitable.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

### 3.    A Relevant Product Market is PC In-Game Payment Processing

102.    The sale of PC in-game payment processing is also a relevant product market.

103.    The term "PC in-game payment processing," as used in this complaint, refers specifically to transactions between publishers and consumers that occur within games after the initial purchase.

104.    To facilitate PC in-game transactions, a PC in-game payment processing system is required. PC in-game processing systems process in-game transactions by storing user information, verifying payment details, processing the disbursement of funds, and tracking payment history.

105.    PC in-game transactions afford publishers the opportunity to provide additional monetized content in their games. Through in-game transactions, publishers can sell virtual goods for real money, including unique abilities, character outfits, access to additional features or levels, and other in-game content.

106.    The PC in-game payment processing market is separate and distinct from the market for PC games. For example, a Steam publisher must engage in a separate, involved implementation process to access the tools that Steam makes available for publishers to use PC in-game payment processing.

107.    PC in-game payment processing is a growing market.

108.    Consumers and publishers alike have both expressed the desire to access their in-game payment processing services of choice.  The provision of in-game payment processing services independent from PC games demonstrates that there is separate demand for the two services. For example, the Epic Games Store permits both game publishers and consumers to use a variety of payment processers for in-game purchases. Epic's CEO Tim Sweeney has acknowledged "developers' right to choose among the best stores, in-app payment processors, online services, and engines . . . And to mix and match those components as they wish."[4]

---

[4] Jeff Grubb, *Epic Games Store devs can now choose their own in-game payment processor*, Venture Beat (Dec. 6, 2019), https://venturebeat.com/pc-gaming/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

CLASS ACTION COMPLAINT
PAGE-23

Similarly, independent providers of PC in-game payment processing such as Xsolla have emerged to offer their services across several different platforms.

109.    By contrast, Valve requires publishers and consumers to carry out microtransactions through its in-game payment processing system only. To make in-game purchases, users must use the Steam Wallet. Valve's guidelines for publishers further prohibit them from processing in-game transactions through any in-game payment processing system other than Steam's.

110.    In a competitive market, Steam would be incentivized to offer consumers and publishers the freedom to use their in-game payment processing systems of choice, which would potentially allow these entities to avoid Steam's inflated 30% fee and to seek out services that offer higher quality transaction services at better prices (i.e., lower fees). Valve's restrictions on the use of in-game payment processing systems serves only to allow it to maintain high fees that are ultimately borne by users.

111.    In summary, the PC in-game payment processing market is distinct and separate from other markets.

112.    A small but significant, non-transitory increase above competitive prices for PC in-game payment processing would not cause a significant loss of sales such as to make the increase unprofitable.

113.    Valve's restrictions on rival in-game payment processing services permit Valve to charge supracompetitive fees that increase prices to consumers.

114.    Valve has consistently held monopoly and/or market power, or at least significant monopoly and/or market power, in the PC in-game payment processing market.

**B.    The Relevant Geographic Market Is at Least as Broad as the United States**

115.    The market for PC games extends across at least the entire United States. Valve sells games through the internet and, thus, Steam is accessible throughout the United States and globally to anyone with an internet connection.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

116.     Valve advertises Steam as a tool for publishers to "reach a global audience." Further promoting its global reach, Valve states: "Steam is a global platform with official support for 26 languages across many platform features. Supporting as many languages, currencies, and payment methods as possible enables Steam to provide the best experience possible to customers around the world." Most other PC game distribution channels besides Steam also operate digitally, without geographic limitations. This further emphasizes that the relevant geographic market is at least as broad as the United States.

## VI.    VALVE POSSESSES MONOPOLY AND/OR MARKET POWER IN THE RELEVANT MARKETS

### A.    Valve's Steam Leads in PC Games and In-Game Payment Processing.

117.     Valve's Steam has an unrivaled position as the leading digital distribution platform for PC games.

118.     Steam is the top PC game platform in the United States with more than 75% market share. Valve's market share for PC in-game payment processing is likely similar because Steam processes 100% of in-game payment transactions for Valve's PC games.

119.     Industry participants recognize Steam's dominance over the market for PC game sales:

- One online source states, "Steam dominates the market with a market-dominant number of active players daily."

- A 2015 handbook about small-developer games observed that "[t]he portal of choice is most definitely Steam. In every indie sales report I've seen, Steam sales eclipse all other portals by a large margin, often selling several times more than on other portal sites."

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

- Another 2020 publication found that "[a]s of today, Valve holds the monopoly on indie game sales for the PC market" and compared to "[s]maller stores" such as GOG and Itch.io "in terms of users or sales volume, neither come close to Steam."

- A 2019 Epic Games Store board presentation stated that Steam had a 94% market share in 2018.

120. Publishers face significant difficulty avoiding Steam while still reaching consumers. As discussed elsewhere herein, many other outlets for PC games rely on Steam Keys, which means that they still sell Valve's product. A Steam Key is a digital "key" enabling consumers to download a PC game through Steam.

121. Most consumers and publishers are unable to avoid using Steam. For example, publishers cannot avoid using Steam by self-publishing their games because they lack the resources to establish and maintain their own digital storefronts. Even if publishers could surpass the financial and other barriers to entry, building a user base would be nearly impossible due to Valve's dominance and its anticompetitive actions to prevent new entrants and change.

122. Due to its extensive market share and user base, consumers and publishers view Steam as a platform they must do business with. As explained by an Electronic Arts executive, PC game publishers "want to be where the players are," which means Steam. Although some developers have expressed concern with this fact, stating, "As a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."

123. A long-time Valve employee remarked, "Valve was really all about controlling the flow of an entertaining experience. Having your hand on that knob, deciding when to turn it up, turn it down." The company's name, "Valve," aptly serves as a "compelling metaphor."

124. Valve has consistently held monopoly and/or market power, or at least significant monopoly and/or market power, in the PC games and PC in-game payment processing markets.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

1

**B.      There are High Barriers to Entry.**

2

125.    The PC game and PC in-game payment processing market feature numerous

3

barriers to entry, reinforcing Valve's monopoly and/or market power.

4

126.    These barriers are typical for technology platforms. The Congressional "Digital

5

Markets Report" outlines typical barriers for such platforms, including network effects, switching

6

costs, data accumulation, and economies of scale and scope.[5] Each of these obstacles is present in

7

the PC game and PC in-game payment processing markets, and Steam in particular.

8

127.    A former Valve employee once observed, "In the Internet age, software has close to

9

zero cost of replication and massive network effects, so there's a positive feedback spiral that

10

means that the first mover dominates." Steam serves as a link connecting consumer gamers to

11

other gamers and publishers. As more consumers engage with the platform, its value increases for

12

both consumer gamers (through direct network effects, enabling them to find others to play with

13

and building a more robust social network) and publishers (via indirect network effects, providing

14

access to a larger audience). Similarly, as more publishers use Steam, its value further increases for

15

gamers.

16

128.    Steam's platform incorporates social networking features, communities of game

17

"modders"—users who modify one or more aspects of a game—and an achievement system that

18

tracks gamers' progress. Users with Steam accounts can create a network of friends and teammates

19

that is accessible across any game on Steam. This allows gamers to easily find friends to play with,

20

without needing to search for them each time they purchase or play a new game.

21

129.    Many large technology firms maintain their market power because it's difficult for

22

users to switch away from their platforms. Although PC gamers can technically "multi-home" by

23

24

25

[5] Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Investigation of Competition in

26

Digital Markets, at 40 (Oct. 6, 2020) https://judiciary.house.gov/uploadedfiles/ competition_in_digital_markets.pdf?utm_campaign=4493-519.

27

28

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

installing various gaming platforms, Steam creates strong lock-in effects through a user's game library and data, including achievements and social connections.

130.    Valve collects detailed data on game usage, preferences, social networks, and other activities on its platform, and uses this information to enhance its monopoly and/or market power. The accumulation of such data "can serve as another powerful barrier to entry for firms in the digital economy" and is "self-reinforcing." According to the American Bar Association's Antitrust Law Section:

> Big data and data analytics can create and amplify feedback effects. For example, more people using a product can mean that more data, and more diverse data, will be collected, allowing the company to both improve its products as well as potentially identify and offer new ones. This in turn can attract more customers, leading to a positive feedback loop, helping a company to grow and potentially dominate the market. Indeed, data-driven markets may 'tip towards one or two products or platforms.

131.    Valve also has access to detailed information about its competitors' operations. As the gatekeeper of the Steam platform, Valve sets the terms under which game publishers, including its rivals, can access it. This allows Valve to favor or punish specific games or publishers, and to alter the rules whenever it feels threatened by particular publishers or competitors in the market.

132.    Valve's gatekeeping ability distorts competition. As owner of the Steam Store, which serves as the primary avenue for publishers to reach PC gaming consumers, Valve has an overarching power over the entire industry. Valve can promote its own games within the store and demote others, add demonstration versions of its games directly to every user's library, and ensure its products are prioritized in sales queues presented to users. Valve also monitors competitors' point-of-sale transactions and microtransactions.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

133.     Valve has also erected barriers to entry such as its restriction on in-game payment processing to Steam only. Absent Valve's prohibition of rivals from offering such services, there would be other payment processing services able to compete with Steam.

134.     The anticompetitive effects detailed throughout this complaint further illustrate Valve's monopoly and/or market power. Valve's conduct has resulted in supracompetitive prices in the PC games and PC in-game payment processing markets, reducing market-wide output in terms of quality, innovation, and consumer choice. Because of Valve's restrictive practices, consumer gamers do not benefit from seeking out alternative distributors, explaining why Valve's market share remains above 75%, despite the presence of potential competitors.

**C.     Major, Well-Resourced Rivals Have Been Unable to Compete with Steam**

135.     Even the most prominent publishers view Steam as an essential platform, illustrating the difficulty of creating a rival PC gaming platform given Valve's dominance and anticompetitive behavior. Major publishers—including Epic Games, EA, Microsoft, Discord, and Humble Publishing—have attempted to avoid Steam and launch viable competitor platforms. Each has failed to establish a strong commercial presence due to Valve's dominance and anticompetitive conduct.

136.     Epic, known for the massive success of *Fortnite*, which generated over $4 billion between 2017 and mid-2019, launched its store partly because, as its CEO noted, "[s]tores extract an enormous portion of game industry profits and are ripe for disruption." Epic, as a leading game publisher, aimed to avoid excessive commissions and promote a low-commission model for the industry. To attract publishers, Epic offered a much lower 12% revenue share and waived the usual 5% royalty for developers using its Unreal Engine after a revenue threshold. Epic determined that a 12% commission was sufficient to cover store costs in a competitive market. It also invested hundreds of millions of dollars to secure exclusivity deals, spending $444 million in 2020 alone, compared to $265 million in third-party game sales that year.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

137.   Epic has heavily invested in attracting gamers to its platform by giving away large quantities of free games. In 2020, it gave away 103 titles worth a combined total of $2,407, resulting in 749 million free game claims by customers.

138.   The Epic Games Store also attempts to compete with Valve by securing timed exclusives from publishers through various incentives, including minimum revenue guarantees and upfront payments. These arrangements enable publishers to sell games at potentially lower prices due to a more favorable revenue share, which can boost sales or improve game quality, thereby increasing sales.

139.   Epic employs exclusives to draw users to its store, aiming to disrupt Steam's strong market position by attracting players who want to access the latest popular games, thus jumpstarting network effects. However, this exclusivity strategy has caused backlash among gamers who resent either having to wait for a Steam release or use an alternative platform. One article notes that "Poaching titles from Steam isn't the best of practices, especially when such an immense amount of backlash is received from fans far and wide." Despite the controversy, the strategy did help grow the Epic store's user base.

140.   Despite its aggressive tactics, the Epic Games Store has not significantly cut into Valve's market share. For instance, even though Epic secured exclusivity for high-profile games like *Borderlands 3*, the game was later released on Steam, where it achieved commercial success. Analysis of 2019 figures indicates that despite its efforts, Epic's store likely captured only "a little above 2%" of the market. To acquire this market share, Epic spent $880 million while earning $680 million in revenue.

141.   In 2020, the Epic Games Store continued a similar pattern, with PC gamers spending a total of $700 million on the platform, which included around $435 million from sales of Epic's proprietary games. Epic also gave away products valued at $2.4 billion while only generating $700 million in revenue through its storefront.

CLASS ACTION COMPLAINT
PAGE-30

142.    Considering the PC game distribution market is approximately $36 billion, including microtransactions, Epic's market share stands at around 1.9%, even after two years of aggressive and well-funded efforts to compete with Steam.

143.    One industry analyst explained, "Two years and four months after its inception on December 4, 2018, the Epic Games Store hasn't done much for its parent company aside from being one of its biggest money losers." According to court documents, Epic Games Store resulted in approximately $181 million in losses in 2019 and $273 million in losses in 2020. Epic has asserted that its 12% commission covers the costs of running the store, indicating that these losses stem from heavy promotional spending aimed at challenging Valve's market dominance, rather than from an inadequate revenue share.

144.    According to Epic Vice President General Manager Steve Allison, as of 2023—nearly five years after its launch—the Epic Games Store remains unprofitable. In September 2023, Epic laid off 830 employees—roughly 16% of its workforce.

145.    The Epic Games Store exemplifies how even a well-funded publisher with a vast user base struggles to dent Steam's market share. Valve's anticompetitive conduct plays a significant role in the Epic Store's difficulties. Due to Valve's PMFN, other publishers on the Epic Store cannot price their games lower than on Steam, restricting Epic's ability to attract users and build market share. Publishers can only avoid the PMFN by completely withdrawing from Steam, a strategy that is not economically feasible. As a result, publishers are forced to comply with the PMFN, leaving Epic's lower commission structure unable to counteract Valve's supracompetitive 30% rate.

146.    Other potential Steam competitors do not possess the financial resources and influence of Epic and are therefore unable to offer exclusives attractive enough to publishers. As a result, exclusive deals are a rare promotional strategy in the PC game distribution market, unlike in console gaming. For instance, Sony PlayStation offers around 300 games exclusive to its platform as a way to entice consumers to choose PlayStation over competing consoles like Xbox.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

147.     Indeed, even billion-dollar companies with popular PC games have been blocked from successfully competing against Valve in the PC game distribution market.

148.     Electronic Arts (EA), an American video game company and the second-largest gaming company in the Americas and Europe, attempted to enter the PC game distribution market but failed. EA currently has a market capitalization of $38.68 billion.

149.     EA launched its Origin store and game launcher on June 3, 2011, as a "direct-to-consumer gaming platform," allowing gamers to buy, download, and play games directly from EA, bypassing Valve's commission. Initially, Origin featured only EA-developed games but soon expanded to include releases from other major publishers such as Warner Bros., THQ, and Capcom Entertainment, Inc.

150.     News articles at the time described Origin as "the biggest threat to Steam's dominance yet." Origin quickly gained a user base of over 50 million registered users, leveraging EA's high-profile franchises, including *SimCity*, *The Sims*, and *Battlefield 3*.

151.     To jumpstart Origin's success, EA initially mandated that all EA games use the Origin platform, even if purchased through other distributors. This decision resulted in EA withdrawing its games from the Steam Store, as Steam does not permit publishers to sell versions of games tailored for other platforms. While other distributors like GameStop were willing to sell Origin-enabled versions, Valve would not permit this on the Steam Store. EA explained, "At present, there is only one download service [Steam] that will not allow this relationship. . . . Steam has imposed a set of business terms for developers hoping to sell content on that service—many of which are not imposed by other game services."

152.     Despite the appeal of its popular franchises like *FIFA*, *The Sims*, and *Battlefield*, EA could not overcome Valve's anticompetitive practices in the PC game distribution market and eventually returned its games to Steam in 2020 to "be where the players are." As one article put it: "It has been a long and largely fruitless road for Origin, EA's PC gaming client that it had planned on building into a rival of Valve's Steam. What was originally supposed to have been the chief

CLASS ACTION COMPLAINT
PAGE-32

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

antagonist to Steam in the ongoing PC gaming platform wars instead is best described as a failure to launch."

153.    Due to Valve's conduct, EA found itself forced into becoming another publisher subject to the 30% fee imposed on most games sold through the Steam Store.

154.    Microsoft also attempted to challenge Valve's position in the market using its popular games and the Windows operating system to attract users to its store. In 2012, Microsoft launched the Microsoft Store (previously known as Windows Store) as its digital distribution platform for PC games. Unlike other stores, Microsoft merged its distribution channels into a single storefront, including games that operated on both Windows and its Xbox console. This integration later enabled cross-platform capabilities between PC and Xbox, allowing users to switch between consoles without purchasing the game separately for each device. The Windows Store was positioned to become a "near-omnipresent digital storefront," providing Microsoft with a captive audience for its software library and offering a potential challenge to Steam's market dominance. Microsoft also leveraged its Windows operating system by pre-installing its store on Windows-based PCs.

155.    To grow its market share in PC game distribution, Microsoft distributed many of its PC games exclusively through the Microsoft Store. This included popular titles such as *Sea of Thieves*, *Age of Empires*, and *Microsoft Flight Simulator*.

156.    Despite these efforts, Microsoft was unable to establish a commercially viable market share in PC game distribution. Consequently, Microsoft retreated from this strategy and began selling its PC games on Steam in 2019. One insider remarked that Microsoft "has given up entirely on that vision . . . to dethrone Steam."

157.    Ubisoft, the publisher behind major franchises like *Assassin's Creed*, *Tom Clancy's Rainbow Six Siege*, and *Anno*, launched its Uplay gaming client and online store in 2009. Although Ubisoft has the capability to publish and sell games independently of Steam, it continues to list its games on the Steam Store because of Valve's grip on the market.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

158.    Amazon tried to enter the market through the Twitch Store, launching a joint platform/storefront in April 2017. It was hailed as "one of the biggest challenges yet to Steam." However, the Twitch Store was shut down just 18 months later.

159.    Google also introduced a competitive offering called Google Stadia, which was intended to be "the future of gaming." Yet, by February 26, 2021, reports indicated that Stadia had "absolutely crumbled under expectations."

160.    Discord provides another example of a failed attempt to compete against Steam in the market. Discord is an application that offers text messaging, voice, and video calling services for gamers to communicate with friends during gameplay. Since its launch, Discord has grown rapidly, with 8.9 million daily users in 2017 and 100 million daily users by 2020. With millions of active PC gamers already using the platform, Discord offered a potentially formidable challenge to Steam.

161.    In August 2018, Discord made a move to enter the market through a vertically integrated offering. At the time, a media intelligence company reportedly called Discord the "biggest threat [Steam has] faced in years." With a large, existing user base registered on Discord for voice communication and social networking, the platform appeared well-positioned to challenge Valve. Discord initially attracted gamers and publishers by offering exclusive periods during which curated games would be available for free. Just a few months after the initial launch, Discord further enticed developers by announcing that all developers, regardless of size, could self-publish their games.

162.    More significantly, Discord introduced a 90/10 revenue split. Publishers were required to pay just a 10% commission, which was one-third of Valve's fee. When Discord announced this new model, it questioned: "Why does it cost 30% to distribute games?" Discord argued that it "[t]urns out, it does not cost 30% to distribute games in 2018." The company settled on the 10% rate because it "covers [its] operating costs," and even suggested it might consider lowering the rate further by optimizing its technology.

CLASS ACTION COMPLAINT
PAGE-34

163.     Despite its massive user base and pro-developer, pro-consumer approach, Discord failed to gain traction. By early 2019, Discord began to "downscale" its efforts, shifting towards a model where gamers would gain access to a pool of games for a monthly fee, a service known as Nitro. By October 2019, Discord announced that it would discontinue the Nitro service.

164.     As noted earlier, Discord's failure was largely due to Valve's anticompetitive behavior. When game developers released their products on Discord to take advantage of its lower commission structure, Valve contacted those developers, enforcing its parity pricing requirements. This intervention limited the developers' ability to conduct business with Discord. Discord's low-commission strategy could not attract enough volume because publishers were unable to direct gamers to the Discord store.

165.     As a result, Discord failed to achieve the necessary scale in game distribution to challenge Valve's market dominance and pressure its supracompetitive prices. Without the ability to lure publishers with higher profits and attract gamers with lower prices, Discord's efforts ultimately fell short, leaving Valve's 30% commission unchallenged.

166.     Despite Discord's inability to enter the market successfully, Valve perceived the platform as a potential threat. As Discord gained popularity as a communication tool for gamers, Valve began to copy Discord's features in Steam. For instance, Valve introduced "Steam Chat," offering a friends list, secure voice chat, and group channels. A reporter for Business Insider noted that "The update takes many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."

167.     Only a select few PC games have managed success outside of Steam, and these are typically games with a long history of recognition. For example, "League of Legends," released in 2009, managed to bypass Valve's dominance due to its extensive and dedicated user base. However, such cases are the exception, as Steam hosts over 50,000 games, while the number of franchises that can avoid using Steam entirely can be counted on two hands.

CLASS ACTION COMPLAINT
PAGE-35

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

168.    Valve has expanded its market power through ancillary services offered on Steam. One such example is the "Steam Workshop," described as a hub for player-created content and tools that facilitate the publishing, organization, and downloading of content into games. This marketplace provides additional revenue for Valve. When digital goods are sold through the Steam Workshop, Valve takes 75% of the sale price, leaving only 25% for the content creator.

169.    Valve has publicly highlighted the payments it has made to creators of digital goods, claiming to have paid over $57 million to Steam Workshop contributors. However, this amount implies that Valve earned approximately $171 million in profit by simply acting as an intermediary between creators and their customers. This demonstrates Valve's ability to generate substantial profits through its market dominance.

170.    The anticompetitive effects detailed throughout this complaint further illustrate Valve's market power. Valve's conduct has resulted in supracompetitive prices in the PC game distribution market, reducing market-wide output in terms of quality, innovation, and consumer choice. Because of Valve's restrictive practices, gamers do not benefit from seeking out alternative distributors, explaining why Valve's market share remains above 75%, despite the presence of potential competitors in the distribution market.

**D.    There is Direct Proof of Valve's Monopoly and/or Market Power.**

171.    Due to the conduct challenged herein, Valve has charged supracompetitive fees well in excess of marginal costs and in excess of the competitive price, and has enjoyed high profit margins. Valve's 30%+ fee on PC games and PC in-game payment processing is supracompetitive because it is substantially above Valve's marginal costs.

172.    In markets free from Valve's anticompetitive conduct, Steam's fee would be lower than 30%+ because it would be driven down closer to Steam's marginal costs.

173.    For example, Epic Games has acknowledged in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

1   EGS." Epic's CEO, Tim Sweeney, has further confirmed that "[f]ixed costs of developing and

2   supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per

3   cent are marking up their costs by 300 to 400 per cent."

4        174.   Gaming platform Discord likewise observed that "it does not cost 30% to distribute

5   games" and that a platform could "build amazing developer tools [and] run them" through a 10%

6   fee. Discord went on to note that "10% covers our operating costs, and we'll explore lowering it by

7   optimizing our tech and making things more efficient."

8        175.   As one trade news source reported in 2018, Steam's "30-percent revenue cut is

9   *steep*, especially given how little Valve does to earn it nowadays."[6]

10        176.   In addition, Valve employees have internally recognized that its 30% commission is

11   significantly greater than the value of the services it provides. Valve employees candidly

12   acknowledged in internal 2018 emails that "[p]retty much everyone agreed that Steam wasn't

13   worth 30%" and that "Steam hasn't had to compete, and thus has gotten lazy and hasn't had to

14   change revenue share." Another 2018 internal email acknowledged "a drumbeat from developers

15   that 30% is too big of a cut for what we provide."

16        177.   Due to the conduct challenged herein, Valve has been able to charge its 30%+ fee,

17   which ultimately raises prices to consumers and hampers innovation by restricting the potential

18   earnings of publishers.

19        178.   Valve's excessive and supracompetitive fees serve as direct evidence of its

20   monopoly and/or market power.

21

22

23

24

25   ―――――――――――――――――

26   [6] Hayden Dingman, Opinion: *Bethesda.net is Broken: Why Game Makers Who Abandon Steam Need to Get the Basics Right*, PC World (Nov. 30, 2018), https://www.pcworld.com/article/402909/bethesda-net-fallout-76-no-steam.html.

27

28   CLASS ACTION COMPLAINT
PAGE-37

    CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

VII.   **VALVE HAS UNLAWFULLY RESTRAINED TRADE AND MONOPOLIZED THE PC GAME DISTRIBUTION MARKET**

179.    Valve gained its dominance in the PC game distribution and PC in-game payment processing markets not by competing on the merits but by using anticompetitive constraints to establish and sustain its monopoly power.

A.    **Valve Uses Its PMFN to Prevent Competition on Price**

180.    Valve protects itself from competition by imposing a PMFN on game publishers who list their games on the Steam Store. As with other PMFNs, Valve's PMFN forces publishers to maintain the same or higher prices for their games across all distribution channels, even those not linked to Steam, and even when those channels offer more competitive fees, substantially lower than Valve's 30% cut.

181.    Valve's PMFN has been expressed through various forms, both written and informal, over time. It has never been removed and remains in effect to this day. Regardless of the iteration, the PMFN always serves to suppress price competition that could challenge Steam's market control. Epic Games' CEO remarked that "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then: 1.) Valve can simply say 'no.'"

182.    Valve monitors prices closely. Steam's guidelines stipulate that publishers' "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days." This allows Valve to keep a close watch on prices and ensure compliance with its PMFN by overseeing any changes in pricing.

183.    Through the PMFN, Valve maintains control over publishers, using threats and penalties to ensure they do not offer discounts to draw customers to other distribution channels. Any publisher that fails to comply with Valve's rules risks losing access to the Steam platform entirely, a blow that could be disastrous given that the majority of PC gamers use Steam.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

184.     The reach of Valve's PMFN is especially damaging because it affects not just Steam-enabled versions of PC games but also all other versions of those games developed for other platforms. In this way, the PMFN warps competition for all PC games, not just those sold on Steam.

185.     The PMFN also hampers competition from other distribution channels. In order to compete with Valve, rival platforms need to attract a significant number of gamers and publishers, leveraging the network effects inherent in platform-based economics. The most straightforward way for a competing platform to achieve this is by reducing publisher fees. In a competitive market, this would encourage publishers to participate in the platform and, without the PMFN, would enable publishers to offer lower prices that would steer customers away from Steam.

186.     However, because of Valve's PMFN, Valve essentially controls the retail prices publishers can offer, setting a price floor across the market. Even if a competing platform offers publishers lower commissions than Valve's 30%, publishers are unable to attract gamers to the rival platform through better pricing. They must charge the same price across all platforms and offer the same content, leaving gamers little reason to move away from Steam and its incumbent advantages.

187.     Valve has repeatedly used its PMFN to prevent potential competition. For instance, Valve invoked the PMFN to shut down competition from the Discord Store. Discord tried to compete by introducing a store that charged only a 10% commission—one-third of Valve's rate. Publishers saw this as an opportunity to increase their share of revenues and tried to attract gamers to Discord with better pricing. But Valve blocked this by enforcing its PMFN, preventing publishers from offering discounts on Discord.

188.     Valve also clearly outlines its PMFN in formal rules. One of Valve's guidelines explicitly states: "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers." While these rules appear to focus on Steam Keys, Valve has made it

known to publishers that the same requirements apply to all sales. As Valve told one game

publisher: "We basically see any selling of the game on PC, Steam key or not, as a part of the same

shared PC market—so even if you weren't using Steam keys, we'd just choose to stop selling a

game if it was always running discounts of 75% off on one store but 50% off on ours . . . ."

189.    Likewise, a previous version of Valve's guidelines stated: "You are welcome to

generate keys for resale with other retailers, including your own website. However, your product

must also be available for sale on Steam. If you are hoping to receive exposure to Steam

customers, the price on Steam will have to match prices elsewhere."

190.    Valve used this guidance to threaten developers with losing access to Steam's

customer base if they offered discounts on rival platforms, even when those platforms provided

more favorable terms for publishers.

191.    Whenever publishers request Steam Keys, Valve reminds them of these restrictions

through online prompts. Publishers must agree that "I understand that I need to sell my game on

other stores in a similar way to how I am selling my game on Steam" and "I agree that I am not

giving Steam customers a worse deal."

192.    Publishers are also required to agree that "while it's OK to run a discount on

different stores at different times, I agree to give the same offer to Steam customers within a

reasonable amount of time." Valve enforces these rules not just for Steam Key games, but for all

games.

193.    Valve makes it clear to publishers that these restrictions are in place to "avoid a

situation where customers get a worse offer on the Steam store." Essentially, the PMFN prevents

gamers from getting better prices on competing platforms, ensuring Valve's dominance.

194.    Valve also enforces the PMFN through informal communications. For example, in a

July 2, 2017 thread on the Steamworks Development forum titled "Patreon and Steam keys," a

publisher inquired into the "rules regarding distributing/selling a game outside of steam." A Valve

employee, "TomG," explained: "The biggest takeaway is, don't disadvantage Steam customers.

CLASS ACTION COMPLAINT
PAGE-40

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

For instance, it wouldn't be fair to sell your DLC for $10 on Steam if you're selling it for $5 elsewhere or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well."

195.     This response highlights the duplicitous rationale Valve offers for its PMFN. While it frames its restrictions as protecting consumers, the real goal is to prevent consumers from benefiting from discounts that publishers might offer, thus maintaining Valve's 30% fee and its dominance in the market.

196.     In another example, TomG advised a game publisher to "[t]hink critically about how your decisions might affect Steam customers, and Valve. If the offer you're making fundamentally disadvantages someone who bought your game on Steam, it's probably not a great thing for us or our customers." In the same thread, TomG explained that Valve would not generally sell a game on Steam if it was available at a lower price on another platform, stating that "we'd want to get that lower base price as well, or not sell the game at all."

197.     There are numerous examples of Valve enforcing its PMFN. For instance, on December 3, 2018, Steam account manager Tom Giardino reportedly told publisher Wolfire that Steam would delist any games available for a lower price elsewhere, regardless of whether Steam keys were involved. Similarly, another Valve employee informed a developer that a standalone version of their game, even if it didn't use Steam technology, would have to be priced the same as the Steam version.

198.     Valve has gone even further by prohibiting publishers from informing consumers about its 30% commission. While publishers are allowed to promote other storefronts, they are not permitted to disclose the amount Valve collects in commission, further limiting the ability of publishers to steer consumers toward better, more affordable platforms.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

Case 2:24-cv-01735   Document 1   Filed 10/23/24   Page 45 of 72

**B.** **Valve Has Further Restricted Competition by Tying Its In-Game Payment Processing System with Its PC Game Distribution**

199.     After a consumer has purchased a game in the PC Game Distribution market, Publishers often provide additional in-game enhancements for purchase. These "microtransactions" are not processed through a PC Game Distribution platform. Instead, publishers must rely on a PC In-Game Payment Processing service to complete these transactions.

200.     There is no technological barrier that would prevent publishers from offering or consumers from choosing different PC In-Game Payment Processing options than the PC Game Distribution platform on which the games themselves are purchased. For games purchased from the Steam Store, however, Valve strictly prohibits alternative In-Game Payment Processing options. Instead, Valve's publisher guidelines require that Steam users make in-game purchases exclusively through the Steam Wallet—Valve's In-Game Payment Processing service—and mandates that developers use Valve's "microtransaction APIs" for processing payments.

201.     By forcing the use of its own payment processing system, Valve ensures it can collect its 30% commission on all in-game purchases made in games distributed through Steam. This allows Valve to profit both at the initial purchase of the game and with every subsequent in-game transaction.

202.     This tying arrangement not only helps Valve maintain its dominance in the PC In-Game Payment Processing market, but also represents an unlawful tying arrangement that, in itself, constitutes a violation of Section 1 of the Sherman Act.

203.     Moreover, this unlawful tying arrangement, along with Valve's PMFN and anticompetitive conduct to prevent viable rivals from competing with its supracompetitive fees, has allowed Valve to establish a second monopoly in the In-Game Payment Processing Market.

CLASS ACTION COMPLAINT
PAGE-42

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

1

2

3

**VIII.   ANTICOMPETITIVE EFFECTS**

204.    In a competitive marketplace, Valve would be compelled to vie with other digital storefronts in areas such as pricing, revenue-sharing agreements, promotional activities, and more. However, Valve uses its restrictive contracts, PMFN, tying arrangement, and other limitations to block competition, ultimately harming consumers.

205.    This approach allows Valve to maintain a commission rate higher than what would prevail in a more competitive environment. The only way for publishers to avoid Valve's restrictive practices is to completely bypass using Steam. Unfortunately, there are no viable economic alternatives, leading most publishers to view Steam as indispensable.

206.    Most developers thus have no choice but to pay Valve's supracompetitive fees. However, these companies still must recover their costs to remain profitable. Accordingly, they must—and do—build Valve's fees into the prices they charge consumers for games and in-app purchases. If not for Valve's challenged conduct, competition would lead to lower platform fees across the market, and developers would have the incentive to lower their prices to battle for sales volume.

207.    By removing these incentives, Valve's conduct has led directly to gamers overpaying and—by reducing demand for PC gaming and in-app purchases—decreases output below competitive levels.

208.    According to its founder, Valve is a "tremendously profitable" endeavor; indeed, on a per-employee basis, it is among the most profitable companies in the world. In 2015, Valve earned over $2 billion per year in profit—more than $5 million per employee. Internally, Valve has recognized that Steam's profitability is an "outlier" compared to other powerful tech companies like Apple, Alphabet, and Netflix. These profits far exceed competitive levels and are maintained only through the anticompetitive means described above, coming at the expense of consumers.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

209.    Over the years, many established firms, including tech giants and leading game publishers, have made efforts to develop alternative platforms that could compete with Steam; each time, these would-be competitors failed to meaningfully challenge Valve's monopoly.

210.    The lack of success by these rivals is not because Valve's product is superior or preferred by consumers. As outlined, all these competitors attempted to offer platforms with equal or better features and functionality, while charging a lower commission rate. Yet despite providing a comparable product at a lower cost, rivals failed to gain market share or cause a reduction in Valve's commission rate as economic theories would predict. Their efforts were undermined by Valve's anticompetitive practices detailed in this complaint.

211.    Moreover, in 2018, Valve adopted a tiered pricing system to disincentivize large publishers from competing directly with Steam. Valve's commission structure provides large publishers with a reduced rate of 25% for Steam sales exceeding $10 million and 20% for sales above $50 million. Interestingly, this incentive system is the reverse of what other platforms typically offer. Most app distribution platforms provide reduced commissions to small developers, acknowledging their thinner profit margins and aiming to attract their participation. For instance, both Apple and Google apply a reduced 15% fee tier for smaller developers with annual revenues below a specified threshold. In contrast, Steam adopts the opposite approach, essentially refunding fees solely to its largest publishers.

212.    Steam offers its most prominent publishers a better deal for a specific reason: they are the only developers that could potentially compete with Steam. Valve's volume discounts serve to discourage such competition. In Steam's own announcement about this pricing scheme, it was stated that the aim of these incentives was to reward "developers of big games" by "aligning their interests with Steam." These reduced commissions have granted large publishers millions of dollars in extra revenue, diminishing the motivation they might otherwise have to challenge Steam by self-distributing or using non-Steam channels exclusively.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

213.     Any competitor aiming to challenge Steam in the PC game distribution market must contend with the significant network effects Steam enjoys, such as its vast library of games already purchased by users, social networking functionalities, an integrated achievement system, and the established modding community. Competitors would need to convince both gamers and publishers to forgo these benefits in favor of a new platform. Given Valve's anticompetitive actions combined with these advantages, it becomes almost impossible for rivals to build a commercially viable alternative to Steam.

214.     Well-established firms with substantial financial resources, like EA, Microsoft, and Amazon, have invested considerable effort and time into attempting to challenge Steam's dominance. Despite their efforts, they were unable to make a significant impact due to Valve's anticompetitive behavior, including the use of its PMFN clause, which prevents them from competing on price. Although these potential competitors tried to undercut Valve's commission rate to attract customers, they couldn't effectively lure consumers to their platforms with lower prices because of Valve's PMFN.

215.     By utilizing the PMFN, Valve ensures that the retail prices on the Steam Store are equal to or better than those offered on any competing distributor's storefront. As a result, this PMFN enables Valve to eliminate price competition from rival storefronts.

216.     PMFNs discourage publishers from offering lower prices in any sales channel since discounts must be extended to all buyers. Additionally, PMFNs create artificial obstacles for market entry. For instance, if a new entrant wants to attract customers by offering lower prices, it can do so by selectively negotiating with suppliers for a discount in return for increased sales volume or other favorable terms. However, if those suppliers also supply the incumbent (Valve in this case), the incumbent's PMFN requires them to charge the same price on the entrant's platform. This restriction hampers the entrant's ability to present an appealing offer to customers and inhibits new competition that could drive prices down.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

217.     When a company imposes a PMFN that restricts lower pricing on other platforms, this practice "serves to suppress competition on the crucial dimension of price," preventing new entrants from undercutting the dominant platform's commission.[7] Without the PMFN, consumers could be drawn to the competitor's platform.

218.     Because of the numerous game developers selling through the Steam Store who are subject to the Valve PMFN, discount platforms cannot compete effectively. Developers are discouraged from lowering their prices since they would need to do so across all platforms, negating the potential financial benefits from lower-commission storefronts.

219.     Economic models indicate that when a dominant platform enforces a PMFN, several outcomes occur: (a) platform fees increase; (b) retail prices rise; and (c) low-cost business models are disincentivized from entering the market. For instance, the Boik & Courts model demonstrates that a lower-priced entrant, such as Discord, cannot gain market entry successfully because the PMFN prevents the entrant from reducing prices to attract both sellers and consumers.[8]

220.     Valve's PMFN, as described above, leads to several negative effects: (a) it raises consumer prices, (b) it prevents rival platforms from engaging in price competition, (c) it discourages new entry by platforms that charge lower commissions, and (d) it suppresses output from game developers.

221.     Steam's dominance in the PC game distribution market is firmly established, and its strong network effects make change difficult.  Valve combines its incumbent advantage with anticompetitive conduct designed to make effective competition virtually impossible—as illustrated by well-resourced companies' failure to make inroads into Steam's monopoly position. Moreover, Valve retaliates against publishers and platforms attempting to introduce competition,

---

[7] Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Pol'y Int'l 86 (2015).
[8] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (2016).

1    further preventing any meaningful competition that could drive down commission rates in the

2    Steam Store.

3        222.    Because Valve's PMFN blocks publishers from offering discounts on competing

4    platforms, it obstructs competition that could put downward pressure on Valve's inflated 30%

5    commission rate. This also prevents new entrants from gaining the scale needed to challenge

6    Valve's dominance in a meaningful way.

7        **A.    Valve's Inflated Commission Rate Is Unrelated to Its Costs or Steam's Benefits**

8        223.    Valve's 30% commission rate charged on most sales is higher than what it would be

9    in a competitive market. Valve originally set this rate based on commissions charged by large

10   media companies decades ago for physical media distribution, such as VHS tapes sold through

11   brick-and-mortar stores. However, as a digital distributor, Valve does not bear the costs associated

12   with physical distribution, such as manufacturing tapes or disks, packaging, shipping, real estate,

13   or employing sales personnel.

14       224.    In economic terms, a supracompetitive price is one that significantly exceeds the

15   marginal cost. Physical retailers maintained a 30% commission at the time Steam launched

16   because it reflected the high costs of running brick-and-mortar stores, including real estate

17   expenses. Valve, as a digital retailer, does not face such costs. Its variable costs for digital

18   distribution are nearly zero, meaning that the 30% commission is almost entirely profit. In a

19   competitive market, where digital distribution lowers costs, economics suggests that commissions

20   would decrease accordingly.

21       225.    Valve's initial decision to set its 30% commission based on the commission set by

22   retailers does not mean Valve's rate was competitive at the time, nor does it justify maintaining

23   that rate today. Economic analysis indicates that the cost savings from digital distribution should

24   have translated into a temporary profit, which would diminish over time in a competitive

25   environment.

26

27

28   CLASS ACTION COMPLAINT
     PAGE-47

226.    This phenomenon is similar to what happens when generic pharmaceuticals are introduced. In the U.S., the first generic entrant that successfully files an abbreviated new drug application ("ANDA") with the FDA enjoys a monopoly for six months. During this period, the initial generic monopolist can set prices 20-30% above long-term marginal costs, but as more producers enter the market, prices steadily decline.

227.    More broadly, it is typical for new industries to go through an initial phase where a small number of firms earn significant profits, followed by a phase where rapid entry of new firms leads to increased competition and a reduction in profits.

228.    Valve has blocked consumers from experiencing these economic benefits. Its anticompetitive practices have prevented the phase where rapid entry of new firms would drive down commissions and profits. While many competitors have tried to enter the digital distribution market, Valve's conduct has stifled true competition, allowing it to keep its prices high, to the detriment of consumers.

229.    Basic economic theory and market experience suggest that competition from other digital distribution platforms would quickly force Valve's commission rates down. While several competitors attempted to lower their commissions to compete with Valve, they failed because Valve's anticompetitive actions prevented them from truly competing on price. This occurred despite the decreasing costs of digital distribution.

230.    The 30% commission Valve charges today does not reflect current market conditions or the cost structures of digital distribution. Valve has never operated without substantial market power. The restrictive practices detailed here have allowed Valve to continue charging a commission rate that was originally intended to cover the high costs of physical retail, costs that no longer apply.

231.    The expenses Valve incurs to maintain Steam—such as payment processing, content delivery, and development—do not justify the commission it takes from every game sale. The commission is a percentage of the publisher's set price, after accounting for returns, taxes, and

other adjustments. This rate is fixed regardless of the game's complexity, the number of integrated Steam features, or the bandwidth used by purchasers to download the game. This shows that the commission is not tied to Valve's actual costs.

232.    The commission also does not correspond to the value of Steam to the publisher. For most publishers, except those that generate the highest revenues, the commission remains at 30%, regardless of how many Steamworks features they integrate or how much they use other services like community boards or the Steam Workshop. The amount paid to Valve fluctuates based on factors like the publisher's pricing decisions, discounts, and participation in sales events, not based on Valve's costs.

233.    Valve can charge a commission that greatly exceeds its service costs plus a competitive return due to its pricing and marketing restrictions and other anticompetitive practices. In a competitive market, prices are pushed towards a firm's marginal costs. However, Valve does not face such pressure because its restrictive conduct eliminates competition, allowing it to keep its commission rate high. This rate is sustained not because Valve's product is superior but because of its dominant market power.

234.    For instance, when Discord launched its store in 2018, it stated, "Turns out, it does not cost 30% to distribute games in 2018." After analyzing its expenses, Discord found that it could create developer tools, manage them, and still give developers a larger share of the revenue. Discord chose to charge a 10% commission and even considered lowering this rate in the future by optimizing their technology.[9]

235.    Recognizing the threat posed by Discord's lower commission, Valve contacted publishers selling games on Discord to enforce its pricing restrictions. Valve ensured that publishers could not benefit from Discord's lower revenue share by reducing retail prices to attract consumers away from Steam. Additionally, since Discord had social networking tools comparable

---

[9] Discord, Why not 90/10? (Dec. 14, 2018), https://blog.discord.com/why-not-90-10-3761ebef4eab.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

to Steam's, Valve adopted similar features. This conduct prevented the Discord store from growing enough to challenge Valve's commission rate, eventually leading to the store's closure.

236.    Epic Games Store (EGS) adopted a 12% revenue share, explaining that this rate was sufficient to cover its distribution costs and fund ongoing innovation and investment in the platform. However, EGS was "not yet profitable at its current scale" because it was heavily investing in marketing and user acquisition to capture market share.[10] In contrast, Steam, being much further developed, should be experiencing greater economies of scale for its digital infrastructure and lower user acquisition costs.

237.    According to a 2020 report by The New York Times, Epic Games claimed that even with its 12% commission, it still made a profit margin of 5% to 7%. This demonstrates that platforms can operate profitably with significantly lower commission rates than Valve charges.

238.    Epic's CEO, Tim Sweeney, broke down the costs associated with running a digital store. He explained that payment processing for major payment methods costs around 2.5-3.5%, content delivery network (CDN) expenses are less than 1.5%, and other variable operating and customer support costs are between 1% and 2%. Moreover, once a platform reaches a large scale, fixed costs for developing and supporting the platform become negligible. Based on these factors, Sweeney concluded that stores charging 30% are marking up their costs by 300-400%. He emphasized that with Epic taking only a 12% share, the store could still operate profitably.

239.    Ubisoft, which operates its own store without relying on Steam Keys, has also criticized Valve's 30% commission as being too high. Chris Early, Ubisoft's Vice President for partnerships and revenue, described Valve's business model as unrealistic and out of touch with current game distribution trends. As a result, Ubisoft stopped releasing some games on Steam, opting instead for its Uplay store and Epic Games Store, where the revenue split is 88/12 rather

---

[10] Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., Epic Games, Inc. v. Apple, Inc., 4:20-cv-05640-YGR (N.D. Cal. Apr. 7, 2021), ECF No. 407 ¶ 399 (citing deposition testimony of CEO Tim Sweeney, VP & GM of Store Steve Allison, and Head of Business Development for Store Joe Kreiner).

CLASS ACTION COMPLAINT
PAGE-50

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

than Steam's 70/30. However, similar to Electronic Arts (EA), Ubisoft has been unable to completely withdraw from Steam due to its control over the PC gaming ecosystem.

240.    Consumers are also negatively impacted by the resulting higher prices. For instance, in 2019, game publisher Deep Silver sold its game *Metro Exodus* on Steam for $60. Later, it entered into an exclusive contract with Epic, pricing the game at $50 through the Epic Games Store (EGS) and withdrawing the Steam-enabled version from the Steam Store. This strategy benefited Deep Silver, as it received 88% of $50 ($44) from sales through the EGS, compared to 70% of $60 ($42) on Steam. Consumers also benefited, paying $50 instead of $60. This example demonstrates that increased competition in the PC desktop gaming distribution market would benefit consumers.

241.    Because Valve forecloses competition, it has not invested in improving Steam to the level that would be necessary if it faced genuine market pressure. Valve does not need to innovate or address publisher and customer concerns, such as harassment, hate speech, and review bombing, in order to maintain its market position.

242.    Additionally, Valve has neglected basic cybersecurity issues, which leaves users and publishers vulnerable to hacking, identity theft, fraud, and money-laundering schemes. If Valve did not employ its restrictive practices, it would have to address these security concerns to remain competitive.

243.    Due to Valve's PMFN clause and its control over Steam Keys, publishers lack viable alternatives to adequately participate in the market. They are essentially forced to continue using Steam despite its numerous shortcomings.

### B.    Valve's Commission Rate Would Be Forced Down by a Competitive Market

244.    In a market free of Valve's PMFN and other restrictive practices, competition would compel Valve to lower its commission rates to a level that reflects its actual costs plus a reasonable profit, rather than rates inflated by its anticompetitive behavior.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

245.     Absent Valve's restrictions, publishers would be free to collaborate with other platforms to offer exclusive promotions, which serve as valuable marketing tools for both the publishers and stores by attracting customers and boosting game sales. Valve would then have to compete with these other stores in negotiations—offering competitive terms like price reductions, more favorable revenue shares, minimum sales guarantees, or enhanced marketing support to secure exclusives or simultaneous releases on Steam.

246.     According to data from Steam analyzed by Video Game Insights, 96% of the games on Steam are categorized as indie games. These are titles from publishers that generate less than $1 million in sales per game on Steam and have lifetime revenues under $50 million. Because of these criteria, the vast majority of these games will never reach the sales thresholds required to benefit from Valve's reduced commission rate. Valve has internally acknowledged that this structure only benefits the "top revenue earners."

247.     When Valve unilaterally adjusted the commission rate for top-grossing games, it explained: "It's always been apparent that successful games and their large audiences have a material impact on those network effects, so making sure Steam recognizes and continues to be an attractive platform for those games is an important goal for all participants in the network." Valve's stated "hope [was] this change will reward the positive network effects generated by developers of big games, further aligning their interests with Steam and the community."[11]

248.     In effect, Valve admitted that the lowered commission rate for high-selling games was aimed at retaining these major game studios on Steam, preventing them from exploring more financially attractive options on other platforms. Valve recognized that losing these large studios would risk the migration of their extensive fan bases to competitors like the Epic Games Store, which offers more favorable terms to publishers.

---

[11] Valve Corporation, *New Revenue Share Tiers and other updates to the Steam Distribution Agreement* (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

CLASS ACTION COMPLAINT
PAGE-52

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

249.     Although Valve decreased its revenue share for games earning over $10 million, the new rates for all three tiers remain higher than what a competitive market would dictate. By reducing fees for only the highest-grossing games, Valve inadvertently acknowledged that its previous 30% commission was excessively high. However, even the new rates for top-grossing games are still above competitive levels.

250.     The reduction in commission rates is not a volume discount linked to metrics like the number of games sold, bandwidth usage, Steamworks features integrated, or hours of gameplay. Instead, the rate reductions were a strategic concession to the biggest game publishers to keep them on Steam. This move was made in response to more favorable revenue-sharing terms offered by other platforms and the potential for large publishers to self-distribute their games.

251.     Competition for exclusive deals would also provide benefits to both publishers and consumers. For instance, upfront payments from other platforms would allow publishers to invest in additional resources for game development, leading to increased quality, innovation, and a greater variety of games available to consumers. However, Steam's current approach requires publishers to deliver their games under contract, artificially keeping prices high and limiting these procompetitive benefits.

252.     By prohibiting exclusives on other storefronts, Valve exerts undue market control and prevents publishers from securing higher sales and better revenue-sharing agreements that they might otherwise achieve. Without Valve's PMFN and other restrictive practices, publishers would be able to partner with other stores to offer games, DLC, and special deals at potentially lower prices than those on Steam. This would attract customers to rival platforms, shifting market share away from Steam. Moreover, this strategy would enable publishers to reach a wider audience, resulting in increased revenue through more sales, even if offered at a lower retail price.

253.     In a competitive distribution environment for PC games, Valve would be forced to provide more favorable commission rates to publishers, allowing them to retain a larger share of

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

their sales revenue. Essentially, Valve's current 30% commission rate—imposed on the majority of publishers—would be significantly reduced under genuine market competition.

**C.     Valve's Conduct Forecloses Other Stores Offering More Competitive Commission Rates**

254.    Other storefronts have offered—or attempted to offer before being pushed out of business—more publisher-friendly revenue sharing agreements. For instance, Discord had offered a 90/10 revenue split. Indie Game Store provided an 80/20 split, with an option for developers to reduce their share to 70% and donate the remaining 10% to a charity of their choice.

255.    However, due to the PMFN and other restrictions imposed by Valve, publishers cannot leverage these more favorable revenue-sharing agreements to offer their games at lower prices on competing stores in an attempt to increase sales. Both Discord and Indie Game Store have since shut down.

256.    Other digital distribution industries also have lower commission rates. The Google Play Store and Apple's App Store previously charged a 30% commission for distributing mobile apps, a rate that is widely believed to have originated from Steam. However, both stores changed to a 15% commission for developers on the first $1 million in annual revenues. In announcing this reduction, Apple noted that it "will benefit the vast majority of developers who sell digital goods and services on the store, providing them with a reduced commission on paid apps and in-app purchases." Google stated that this fee reduction gives "funds that can help developers scale up at a critical phase of their growth by hiring more engineers, adding to their marketing staff, increasing server capacity, and more."[12]

257.    Former senior App Store executive Phillip Shoemaker explained that when Apple launched the App Store in 2008, it was a "revolutionary" way for app developers to reach customers, and at the time, "people were willing to bite that 30 percent." However, Shoemaker

---

[12] Sameer Samat, *Boosting developer success on Google Play*, Android Developers Blog (Mar. 16, 2021), https://android-developers.googleblog.com/2021/03/boosting-devsuccess.html.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

later stated that "we're realizing that 30 percent is way too much," adding that Apple "should [charge] closer to" the approximately 3% fee that credit card companies charge for transaction processing, given Apple's minimal variable costs for processing app sales. Apple has indeed reduced its commission, and Valve's variable costs are similarly low.[13]

258.    Microsoft also charges a 15% revenue share on all app purchases from its Microsoft Store. If app developers use their own or a third-party commerce platform within their app, Microsoft takes no fee, allowing developers to retain 100% of their revenue. As mentioned earlier, the commission rate for PC games on the Microsoft Store is set at 12%.

259.    Other online marketplaces that sell third-party products also impose significantly lower commission rates than Valve's 30%. For example, Amazon charges between 8% and 17% depending on the product category, eBay charges between 10% and 12%, Etsy charges 5% plus a 3% + $0.25 payment processing fee when using Etsy Payments, Walmart's third-party marketplace charges between 6% and 15%, and Poshmark has a 20% commission for sales over $15.

260.    Valve's 30% commission has never been subjected to competition from rivals in a fair market. When Steam was launched, most game distribution occurred through brick-and-mortar retailers such as Walmart, GameStop, and Best Buy. While Valve competed with these retailers to some extent, it had a significant cost advantage since it did not have to pay for physical locations, staff, packaging, shipping, and other expenses faced by brick-and-mortar retailers. These retailers couldn't effectively compete with Valve by reducing their own commission rates, as doing so would drive them out of business.

261.    Only other digital distributors could have realistically exerted competitive pressure on Valve's excessive commissions. Many have attempted this, but they failed because Valve's anticompetitive actions blocked them. As a result, Valve's 30% commission was never genuinely contested in the market, and the fact that it has remained unchanged illustrates the depth of Valve's

---

[13] Jack Nicas, *How Apple's 30% App Store Cut Became a Boon and a Headache*, N.Y. Times (Aug. 14, 2020), https://www.nytimes.com/2020/08/14/technology/apple-app-store-epic-games-fortnite.html.

antitrust violations. In a competitive market, Valve's commission would have decreased significantly, aligning closer to its near-zero variable costs of digital distribution. That Valve has maintained the same commission rate for almost fifteen years, despite attempts by multiple entrants to compete on price and quality, further demonstrates that this has never been a competitive market.

262.     Valve's anticompetitive actions also limit the number of games sold in the market. Publishers must weigh whether the largely fixed development costs can be recovered through game sales. If publishers were able to earn more revenue per sale (as they could in a market with more competitive commissions), they would develop more games, increasing both the quantity and variety of games in the market. Similarly, if commissions were competitive, publishers could sell their games at lower prices while still making higher profits, thereby boosting overall sales. With higher publisher profits and lower consumer prices, output in the market would increase beyond historical levels.

263.     Valve's conduct has also reduced quality within the market. Due to Valve's high fees, publishers have employed various workaround strategies, often leading to consumer backlash. If Valve charged competitive commissions, publishers would have less economic incentive to pursue these tactics, which would ultimately benefit consumers.

264.     Given Valve's strategic advantages, it doesn't need to offer a competitive level of quality to consumers, including the Plaintiffs, on its Steam Store. Valve reinvests only a small fraction of its revenue into improving and maintaining the Steam Store, allocating very few resources to business development, customer support, and engineering. Competing stores, despite their smaller market share, generally offer superior infrastructure and support.

265.     The lack of investment in the Steam platform has allowed cybersecurity vulnerabilities to persist, posing risks to both consumers and publishers. For example, in 2011, hackers stole "information about Steam transactions between 2004 and 2008," which included "names, email addresses, encrypted billing addresses, and encrypted credit card information,"

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

prompting Valve CEO Gabe Newell to advise Steam users to "watch your credit activity and statements." By 2015, approximately 77,000 Steam user accounts were "hijacked and pillaged each month." In 2016, a "Steam Stealer" malware industry emerged, allowing criminals to defraud Steam users, turning the platform into "the devil's playground." In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed millions of Steam users to hackers, but only after being publicly pressured to do so. Later that same year, Valve stopped the trading and selling of digital items for a game due to concerns that "nearly all key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by global fraud networks engaging in money laundering.

266.    Consumers in the relevant market have been deprived of the benefits of competition, which would lead to reduced prices, higher output, and higher quality services. If Valve did not block price competition for games that utilize Steam, gamers could benefit from having access to a high-quality platform while also enjoying the advantages of competitive pricing in the distribution market. This would improve quality for all participants, while simultaneously lowering costs for everyone.

**D.    Valve's Conduct Excludes Potential Rivals from the Market**

267.    The Valve PMFN creates an entry barrier in the PC game distribution market. While other PC game distributors might try to offer their services at lower prices, either by negotiating more favorable terms with publishers or through innovation and efficiencies, the PMFN hinders their ability to benefit from these strategies. Publishers are restricted from offering their games at lower prices or earlier release dates on these competing stores due to contractual obligations. Since publishers cannot opt out of making their games available on Steam and stores that sell Steam Keys, the PMFN acts as an artificial barrier, stifling competition and limiting the benefits to both publishers and consumers that could arise from other storefronts.

268.    Publishers are discouraged from reducing retail prices to attract customers because they are required to lower the price on Steam correspondingly. To justify a lower price elsewhere,

CLASS ACTION COMPLAINT
PAGE-57

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

they would need to make enough sales on the other platform to compensate for the reduced revenue from Steam sales. Given Steam's dominant market share and Valve's high revenue share, this outcome is unlikely. Customers will continue to buy from Steam, leading to decreased revenue per sale for publishers. As a result, publishers have little incentive to lower prices, even if they receive a higher revenue share on a different platform.

269.    Even when other storefronts offer a better revenue share, publishers cannot entice consumers to switch by offering lower prices. This restriction makes the competing storefront's offer less impactful, forcing publishers to remain dependent on Steam and Valve.

270.    By eliminating price competition and charging publishers a revenue share that is above market rates, Valve limits the number and quality of PC games. This situation reduces publishers' options for distribution and makes it harder for them to earn returns on their investments. Because Valve's conduct stifles competition, other PC game stores struggle to gain market share and effectively challenge Valve's dominant position. As described above, a number of major publishers, including Epic Games, EA, Microsoft, Discord, and Humble Publishing, have tried to battle Steam's coercive terms and launch viable competitor platforms. Time and again, each has failed to establish a strong commercial strategy due to Valve's dominance and anticompetitive conduct.

271.    As a result, publishers are forced to pay Valve a supracompetitive revenue share because Valve prevents competition from other stores that would otherwise drive down its high revenue rate. This situation also harms consumers, as publishers cannot fully invest in game enhancements, the development of new games, or lower retail prices.

## IX.    CLASS ACTION ALLEGATIONS

272.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent,
> purchased a PC game on the Steam Store or purchased an in-game

product from a game distributed on the Steam Store. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

Plaintiffs also bring this action on behalf of the following California subclass:

All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store or purchased an in-game product from a game distributed on the Steam Store. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

273.    When a consumer purchases a game from the Steam Store, the consumer purchases the game from Valve and pays the full retail price to Valve directly. Likewise, when a consumer makes an in-app purchase using a Steam Wallet, that gamer pays Valve to complete the transaction. In both cases, there is no intermediary in the distribution chain between Valve and the consumer. Accordingly, class members are direct purchasers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated commissions directly to Valve.

274.    The class members are sufficiently numerous to make joinder impracticable. Millions of consumers dispersed throughout the United States have purchased PC games and/or in-game products during the class period.

275.    Plaintiffs' claims are typical of the class. Valve's anticompetitive conduct has imposed a common injury on all consumers who purchase games and in-game products on the Steam store, including Plaintiffs, in the form of artificially inflated prices paid to Valve.

276.    Plaintiffs are represented by competent counsel with extensive experience litigating antitrust class actions. Plaintiffs and their counsel have no interests that are averse to or conflict with the interests of class, and they possess the necessary resources to vigorously prosecute this action. Plaintiffs, as class representatives, will adequately represent the interests of the class.

277.    There are numerous questions of law and fact common to the class, including:

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

- the existence and scope of a relevant market for PC Game Distribution;

- the existence and scope of a relevant market for PC In-Game Payment Processing;

- Valve's possession of monopoly power in the relevant markets;

- whether Valve acquired or maintained monopoly power through anticompetitive conduct;

- whether Valve's anticompetitive conduct has led to increased prices, reduced quality, and/or reduced output in the relevant markets;

- whether Valve has illegally tied its PC In-Game Payment Processing services to its PC Game Distribution services;

- the existence and quantity of class members' damages.

278.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Joinder of all class members is impossible, and individual damages are small relative to the burdens of litigation such that it would be impracticable to prosecute an individual action to redress Valve's unlawful conduct.

## X.    FRAUDULENT CONCEALMENT

279.    Valve has affirmatively misled Plaintiffs and the public to conceal its unlawful conduct, including by denying and concealing the existence of its PMFN. In its Answers in the ongoing *Wolfire* litigation, *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563 (W.D. Wash.), Valve denied the existence of its PMFN.

280.    Similarly, in its motion to dismiss, Valve described the existence of its as "thoroughly fanciful," and stated that "[n]o one has ever seen this shadow policy." Most recently, at class certification, Valve described the "price parity component of the alleged PMFN" as a "fantasy" that "does not exist."

281.    As described above, these representations are false and in keeping with Valve's pattern of continuously denying the existence of its PMFN, one of the core elements of its

CLASS ACTION COMPLAINT
PAGE-60

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

anticompetitive conduct. Moreover, because the PMFN is—in Steam's own words—a "shadow policy" that it imposes on publishers through a combination of written rules, unwritten norms, and private communications of which customers are unaware, Valve denied Plaintiffs the opportunity to investigate and assert their claims at the time the conduct commenced.

282.    Valve's affirmative efforts to fraudulently conceal its PMFN policy toll the statute of limitations with regard to the claims asserted in this complaint.

## XI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2)

283.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

284.    Valve has willfully acquired and maintained monopoly power in the relevant market for PC Game Distribution through exclusionary and anticompetitive conduct, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, and its obstruction of competitive strategies.

285.    Valve's actions have no procompetitive justification, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

286.    Valve's conduct has had a substantial effect on interstate commerce.

287.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

CLASS ACTION COMPLAINT
PAGE-61

## SECOND CAUSE OF ACTION

## SHERMAN ACT SECTION 2—ATEMPTED MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2)

288.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

289.    Valve has engaged in exclusionary and anticompetitive conduct in the relevant market for PC Game Distribution, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, and its obstruction of competitive strategies.

290.    Valve has engaged in this anticompetitive conduct with the specific intent of monopolizing the relevant market for PC Game Distribution.

291.    Valve has engaged in this anticompetitive conduct with a dangerous probability of monopolizing the relevant market for PC Game Distribution.

292.    Valve's actions have no procompetitive justification or legitimate business purpose, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

293.    Valve's conduct has had a substantial effect on interstate commerce.

294.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's unlawful conduct.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

**THIRD CAUSE OF ACTION**

**SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME PAYMENT**

**PROCESSING MARKET (15 U.S.C. § 2)**

295. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

296. Valve has willfully acquired and maintained monopoly power in the relevant market for PC In-Game Payment Processing through exclusionary and anticompetitive conduct, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, its obstruction of competitive strategies, and its tying arrangement requiring that consumers use a Steam Wallet to make in-game purchases within games distributed through the Steam Store.

297. These actions have prevented publishers from providing—and consumers from using—alternatives to the Steam Wallet for In-Game Payment Processing.

298. Valve's actions have no procompetitive justification, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

299. Valve's conduct has had a substantial effect on interstate commerce.

300. Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

**FOURTH CAUSE OF ACTION**

**SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET (15 U.S.C. § 2)**

301.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

302.     Valve has engaged in exclusionary and anticompetitive conduct in the relevant market for PC Game Distribution, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, its obstruction of competitive strategies, and its tying arrangement requiring that consumers use a Steam Wallet to make in-game purchases within games distributed through the Steam Store.

303.     Valve has engaged in this anticompetitive conduct with the specific intent of monopolizing the relevant market for PC Game Distribution.

304.     Valve has engaged in this anticompetitive conduct with a dangerous probability of monopolizing the relevant market for PC Game Distribution.

305.     Valve's actions have no procompetitive justification or legitimate business purpose, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

306.     Valve's conduct has had a substantial effect on interstate commerce.

307.     Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

CLASS ACTION COMPLAINT
PAGE-64

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

**FIFTH CAUSE OF ACTION**

**SHERMAN ACT SECTION 1— UNREASONABLE RESTRAINTS OF TRADE THROUGH TYING (15 U.S.C. § 1)**

308.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

309.    Valve has unlawfully tied PC In-Game Payment Processing to PC Game Distribution through its agreements with game publishers.

310.    To make in-game purchases within games distributed through the Steam Store, consumers are required by Valve to use a Steam Wallet. This tie prevents publishers from providing, and consumers from using, alternative in-game purchase processing options.

311.    PC Game Distribution is a separate product with separate consumer demand from PC In-Game Payment Processing. On other gaming platforms, consumers can purchase PC Game Distribution service without also obtaining PC In-Game Payment Processing from the same provider. In other gaming markets, too, these products are frequently sold by separate providers.

312.    In a competitive market, consumers would be able to select from a range of PC In-Game Payment Processing services to process in-game transactions. This competition would prevent Valve from imposing supracompetitive 30% commission on in-game purchases.

313.    Valve has not only market power but a monopoly in the tying product market for PC Game Distribution.

314.    Valve's tie affects a substantial volume of commerce.

315.    Valve's tying conduct has no procompetitive justification or legitimate business purpose, as it does not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to Valve's unlawful tie.

316.    Valve's conduct has had a substantial effect on interstate commerce.

317.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

**SIXTH CAUSE OF ACTION**

**SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS OF TRADE**

**(15 U.S.C. § 1)**

318.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

319.    Valve has entered into contracts with game publishers to unreasonably restrain trade, control prices, exclude competition, willfully acquire and maintain market power in the PC Game Distribution and PC In-Game Payment Processing markets.

320.    In order to distribute games and in-game content through the Steam Store, Valve requires that game publishers agree that the publishers will not offer better prices or superior content for any games or in-game products offered through other platforms. Valve and publishers further agree, in restraint of trade, to coordinate pricing through Valve's pricing guidance, pricing "recommendations," and "post and adhere" pricing system.

321.    These agreements in restraint of trade have had anticompetitive effects in the relevant markets for PC Game Distribution and PC In-Game Payment Processing.

322.    These agreements with publishers have no procompetitive justification or legitimate business purpose, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

323.    Valve's conduct has had a substantial effect on interstate commerce.

324.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

CLASS ACTION COMPLAINT
PAGE-66

## SEVENTH CAUSE OF ACTION

### California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

### (California Subclass)

325.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

326.    Under the UCL, unfair competition includes any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code." *See* Cal. Bus. & Prof. Code § 17200.

327.    California has an overriding interest in ensuring that its residents are permitted to assert claims for public injunctive relief under the UCL.

328.    Valve's unlawful, unfair, and deceptive business acts and practices outlined above violate the UCL. Plaintiffs were injured by these violations, including through their overpayment for PC games and in-game products.

329.    Plaintiffs seek public injunctive relief under the UCL, including a permanent injunction preventing Valve's PFMN, its tying arrangements, and the other anticompetitive tactics Valve uses to maintain monopolies in the PC Game Distribution Market and the PC In-Game Payment Processing Market. By bringing competition into these markets, an injunction would benefit future purchasers of PC games and in-game content, as well as the broader public.

## EIGHTH CAUSE OF ACTION

### Washington State Consumer Protection Act, RCW 19.86 (Nationwide Class)

330.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

331.    The claims alleged above constitute unfair methods of competition under RCW 19.86.020, 19.86.040, and 19.86.030. 248. Valve has engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

CLASS ACTION COMPLAINT
PAGE-67

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915

332.    Valve's contracts and agreements with game publishers are anticompetitive restraints that have the purpose and effect of fixing prices in the relevant market above the competitive level.

333.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

334.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant market above the competitive level.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendant and for the following relief:

A.    That the Court certify this case as a class action and that it appoint Plaintiffs as class representative and its counsel as class counsel;

B.    That the court declare, adjudge, and decree that Valve has committed the violations of the laws alleged herein;

C.    That the Court award Plaintiff and the proposed classes all appropriate monetary relief, to include, but not be limited to, injunctive relief requiring that Steam cease the abusive, unlawful, and anticompetitive practices described herein; declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

D.    That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices

E.    That the Court order such other and further relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT
PAGE-68

**XIII.   JURY DEMAND**

Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: October 23, 2024                           Respectfully submitted,


                                                  CORRIE YACKULIC LAW PLLC


                                                  */s/  Corrie J. Yackulic*
                                                  Corrie J.  Yackulic (WSBA No. 16063)
                                                  110 Prefontaine Place S., Suite 304
                                                  Seattle, WA 98104
                                                  Tel: (206) 787-1915
                                                  Fax. (206) 299-9725
                                                  corrie@cjylaw.com


                                                  Benjamin D. Brown (*pro hac vice* forthcoming)
                                                  Brent W. Johnson (*pro hac vice* forthcoming)
                                                  Robert W. Cobbs (*pro hac vice* forthcoming)
                                                  COHEN MILSTEIN SELLERS & TOLL PLLC
                                                  1100 New York Ave. NW, Fifth Floor
                                                  Washington, DC 20005
                                                  (202) 408-4600
                                                  bbrown@cohenmilstein.com
                                                  bjohnson@cohenmilstein.com
                                                  rcobbs@cohenmilstein.com


                                                  Christopher J. Bateman (*pro hac vice* forthcoming)
                                                  Daniel Gifford (*pro hac vice* forthcoming)
                                                  COHEN MILSTEIN SELLERS & TOLL PLLC
                                                  88 Pine St., 14th Floor
                                                  New York, NY 10005
                                                  Tel: (212) 838-7797
                                                  Fax: (212) 838-7745
                                                  cbateman@cohenmilstein.com
                                                  dgifford@cohenmilstein.com

CLASS ACTION COMPLAINT
PAGE-69

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE S. STE. 304
SEATTLE, WA 98104
TEL. 206-787-1915